233 Cal.App.3d 1486 (1991)
285 Cal. Rptr. 374
In re SARAH M., a Person Coming Under the Juvenile Court Law.
TULARE COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
MARY G., Defendant and Appellant; DOUGLAS M., Intervener and Respondent.
Docket No. F013598.
Court of Appeals of California, Fifth District.
September 10, 1991.
*1488 COUNSEL
Ann Jory, under appointment by the Court of Appeal, for Defendant and Appellant.
Lita O'Neill Blatner, County Counsel, Robert L. Felts, Assistant County Counsel, and Teresa M. Saucedo, Deputy County Counsel, for Plaintiff and Respondent.
James B. Preston for Intervener and Respondent.
Marisa Nayfach, under appointment by the Court of Appeal, for Minor.
OPINION
BEST, P.J.
Mary G. (mother) appeals from a juvenile court order terminating its jurisdiction over her daughter, Sarah M., and awarding the father, Douglas M., custody. She raises numerous claims of error in her effort to *1489 restore the juvenile court's jurisdiction. We will conclude that while there was error, it was not prejudicial.
(1a) We hold in juvenile dependency proceedings in which the court has placed a minor with a formerly noncustodial parent pursuant to Welfare and Institutions Code[1] section 361.2, the juvenile court may: (1) order services for the purposes of improving the contact between the original custodial parent and the child rather than reunifying them; and (2) terminate jurisdiction if it determines its continued supervision is no longer necessary. Termination need not be conditioned upon the completion of any court-ordered services. Nor do the parents' poor communication skills and mutual distrust alone constitute a sufficient basis to continue jurisdiction.

STATEMENT OF THE CASE
Sarah M. (born Feb. 11, 1987) was adjudged a dependent child of the juvenile court in July 1988. The court found as to:
"COUNT I: On or about February 1, 1988, minor was hospitalized as a result of suffering a detrimental and traumatic condition and injury consisting of, but not limited to multiple skull fractures. Such injury would not ordinarily occur except as a result of unreasonable and/or neglectful acts by minor's mother who has responsibility of minor. The mother has sole physical custody of the minor. There is also a history of unexplained injuries of this minor while in the mother's custody.
"COUNT II: On or about February 28, 1988, minor was exposed to a violent altercation in the family home between her mother and mother's boyfriend involving the use of deadly weapons. (Minor's mother's boyfriend was shot and critically injured as a result of said violence.) Mother was holding minor while mother struggled with boyfriend over the deadly weapon. [and]
"COUNT V: The minor is in need of proper and effective parental care or control and has no parent, guardian or custodian actually exercising care or control." In April 1988, prior to making its jurisdictional findings, the court had placed the child with her father.[2]
The juvenile court conducted its disposition hearing in August 1988. It continued the minor's placement with her father. The court did not order a *1490 reunification plan for the mother. It did, however, grant the mother reasonable visitation, leaving to the social worker's discretion whether visitation should be supervised. The juvenile court also ordered the mother to undergo a psychological evaluation to determine visitation suitability.
A review hearing was held in April 1989. At this proceeding, the juvenile court readjudged Sarah M. a dependent child of the court and continued her placement with her father. For his part, the father was ordered to:
"1. Continue to provide for the medical, dental and psychological needs of the minor.
"2. Continue to cooperate with the Court orders regarding visitation for the mother.
"3. Cooperate with any order of the Court regarding visitation for the maternal grandmother, Lori [M.]."
The juvenile court also ordered a "Reunification/Normalization of Visits Plan" for the mother. The plan provided:
"1. Continue in psychotherapy with a licensed psychologist.
"2. Continue to attend and complete the following parenting classes offered by CPS as they become available.
"a. Anger Management
"b. Behavior Management (nearly completed)
"c. Developmental Issues
"d. Communication
"3. Effective the week beginning Monday, April 24, 1989, the mother is to have two (2), three (3) hour visits per week as supervised and arranged by CPS.
"4. If the visits mentioned in item number three (3) proceed without incident, as per Dr. Bindler's definition in the letter of January 3, 1989, then effective the week beginning June 12, 1989, the mother is to have two (2), four (4) hour visits per week. One of the weekly visits is to be supervised by CPS and the other weekly visit is to be alternatively supervised by the maternal grandmother, Lori [M], and the paternal grandmother, Kay [M]. *1491 This arrangement and schedule will remain in effect as long as the visits are without incident until the next Court review of August 11, 1989."
At a second review hearing conducted in October 1989, the juvenile court continued the minor's dependency and placement with the father. According to the court's "Reunification/Normalization of Visitation Plan," the mother was to continue her psychotherapy and parenting classes in anger management and communication. The plan also anticipated unsupervised visitation; however, before that could occur, the mother would have to submit to a second psychiatric evaluation regarding her suitability for unsupervised visitation. The father was to continue providing for the minor's needs and cooperating with the court's visitation orders.
In February 1990, the father successfully moved to terminate the juvenile court's jurisdiction. The court found:
"1. The jurisdiction of the Juvenile Court is terminated since the conditions do not presently exist which caused the Court to assume original jurisdiction, and conditions do not presently exist which would justify initial assumption of jurisdiction under Welfare and Institution Code, Section 300, nor that such conditions are likely to exist if supervision is withdrawn.
"2. Pursuant to Welfare and Institutions Code, Section 362.4, the Court finds that it is in the best interests and protection of the minor child that the legal and physical custody of the minor child shall remain with Douglas [M.], the minor's father, as currently ordered in the related paternity action between the same parties, Tulare County Superior Court, case number 132336."

STATEMENT OF FACTS
In early February 1988, Tulare County Child Protective Services (CPS) received a report from a local hospital concerning multiple, suspicious injuries to Sarah M. These injuries, which included multiple skull fractures and a fractured femur, had occurred since November 1987 when Sarah was nine months old. The mother explained Sarah was a very active child and these were accidents. Throughout the proceedings, the mother has maintained her innocence of any abuse or neglect.
Because the experts were apparently not convinced the mother had abused the child, the juvenile court permitted Sarah to remain with her mother after the dependency petition was filed. The court, however, ordered that the mother's then boyfriend, Brian Frazier, could not be left alone with the child and could not reside in the mother's home.
*1492 On February 28, the mother and Frazier struggled in her home over a handgun. The mother was holding Sarah at the time. During the struggle the mother dropped Sarah who received a bruise on her cheek. The gun also went off, causing Frazier serious injury. The mother maintained Frazier was attempting to commit suicide. No criminal charges were filed as a result of this incident.
Although a warrant was issued on March 3 to detain Sarah, CPS did not locate the child until March 15. Soon thereafter CPS also found the child's father, whose home was evaluated and determined to be suitable for the minor.
During the first year of dependency, the mother visited with Sarah once a week in the presence of CPS. While she was "outraged by CPS staff" at this time, she interacted well with the child. In late 1988, a psychologist, Stephen Binder, evaluated the mother. According to Binder:
"She behaves in a manipulative and demanding way which emphasizes the negative aspects of her personality. Her history is one which suggests a predisposition for negative self-esteem and poor impulse control." Although there was no evidence of psychotic disorders, the psychologist found:
"But her emotional reactivity can be aroused to the point that her judgment [sic] becomes impaired leading to behavior which is not well planned, or controlled. It is not possible to determine if this condition is one which prevailed prior to last February when she lost custody of Sarah, but the trait is present at this time, and is a factor which must be considered in evaluating the subject's suitability for visitation with her young daughter." He diagnosed the mother as demonstrating:
"Dysthymic (Depressive) disorder. [¶] Obsessive Compulsive Personality disorder with dependent features." Binder later added to his diagnosis: "Histrionic Personality Disorder with explosive and antisocial features." He did, however, recommend increasing the amount of supervised visitation for the sake of both the child and the mother.
In February 1989, the mother initiated psychotherapy with another psychologist, Dexter Hardcastle. She also attended parenting classes offered by CPS. In March 1989, visits were increased to two 1 1/2-hour supervised visits each week. The length of each visit increased as well during 1989. Apparently, in mid- to late 1989, the father and mother began conjoint therapy to improve their communication with regard to Sarah.
Following a second evaluation in November 1989, Dr. Charles Davis, a psychiatrist, recommended unsupervised visits between the mother and *1493 Sarah. He believed the mother had a good understanding of parenting issues. He disagreed with Binder's diagnosis. Davis believed the mother had a personality disorder, "not otherwise specified," given the past history in this case, the mother's apparent involvement with drugs, multiple job changes and relationships with men. After the loss of custody and perhaps the shooting incident, the mother suffered, in Davis's estimation, an adjustment reaction. At the time of the evaluation, the psychiatrist characterized her condition as a grief reaction. Her symptoms could have been confused with a major depressive disorder, as Binder had diagnosed. He felt, however, that the mother "has not yet come to terms with the fact that she is responsible for this catastrophe in her life  not the Court, not [CPS], and not [the father]."
Throughout this period, Sarah has lived with her father and stepmother. She has done well in their home. The father and stepmother appeared to have taken care of Sarah's needs.

DISCUSSION

I. STANDARD FOR TERMINATION OF JURISDICTION
Mother contends, and the other parties concede, the juvenile court applied the incorrect standard in terminating its jurisdiction over Sarah M. The court relied upon section 364 and decided conditions did not presently exist which would justify an initial assumption of jurisdiction. However, section 364 applies in cases where the dependent child has not been removed from the original custodial home. (In re Esperanza G. (1985) 173 Cal. App.3d 358, 360 [218 Cal. Rptr. 827].)
Section 364 provides in part:
"(a) Every hearing in which an order is made placing a minor under the supervision of the juvenile court pursuant to Section 300 and in which the minor is not removed from the physical custody of his or her parent or guardian shall be continued to a specific future date not to exceed six months after the date of the original dispositional hearing....
".... .... .... .... .... .... ....
"(c) After hearing any evidence presented by the probation officer, the parent, the guardian, or the minor, the court shall determine whether continued supervision is necessary. The court shall terminate its jurisdiction unless the probation department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of *1494 jurisdiction under Section 300, or that such conditions are likely to exist if supervision is withdrawn...." In this case, of course, the juvenile court did remove the minor from her mother's home. As discussed below, the Legislature did not adopt the same standard for termination in the situation posed here, i.e., where the juvenile court removes the child from one parent's custody and places the minor with the other parent. Thus, section 364 and the juvenile court judge's finding had no bearing on this matter.
Mother complains such error necessarily requires reversal and remand; she cites In re Nathaniel P. (1989) 211 Cal. App.3d 660, 670-672 [259 Cal. Rptr. 555]. On review, it appears mother's reliance is misplaced.
Nathaniel P. was an appeal from an order terminating parental rights, not the juvenile court's jurisdiction. The trial court had ruled an earlier juvenile court adjudication of physical and sexual abuse precluded a father from offering contrary evidence in a Civil Code section 232 termination proceeding. Since different standards of proof applied in each proceeding, the appellate court ruled the father was entitled to have the issue relitigated in the termination proceeding under the appropriate standard of proof. (211 Cal. App.3d at p. 672.) In this regard, the court, at pages 672-673, also quoted from In re Carmaleta B. (1978) 21 Cal.3d 482, 496 [146 Cal. Rptr. 623, 579 P.2d 514]:
"`In a case such as this where fundamental rights are affected by the exercise of discretion by the trial court, we recognize that such discretion can only be truly exercised if there is no misconception by the trial court as to the legal basis for its action. Thus, where, as here, some of the grounds for the trial court's action have been determined on appeal to be ... unsupported, the matter should be remanded for the trial court's redetermination of the ultimate issue on the proper grounds.' [Citation.]"
It is this above quoted language in which mother apparently takes solace. However, her fundamental rights were not affected by the juvenile court's exercise of discretion in the present case. Her parental rights were not terminated. The juvenile court essentially maintained the status quo so far as physical custody and visitation were concerned. It simply, as a preferred alternative, transferred the forum for the parents' disputes from juvenile to family law court.
(2) "`The fact that the action of the court may have been based upon an erroneous theory of the case, or upon an improper or unsound course of reasoning, cannot determine the question of its propriety. No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself *1495 correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' (Davey v. Southern Pacific Co. (1897) 116 Cal. 325, 329 [48 P. 117].)" (D'Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 19 [112 Cal. Rptr. 786, 520 P.2d 10.)
(1b) Accordingly, the following questions arise: under what conditions could the juvenile court have terminated its jurisdiction over Sarah M., and was there sufficient evidence to support such a determination?
Section 361.2, subdivision (a) describes the juvenile court's discretion when it places a dependent child with a formerly noncustodial parent. Section 361.2, subdivision (a) provides:
"(a) When a court orders removal of a minor pursuant to Section 361, the court shall first determine whether there is a parent of the minor, with whom the minor was not residing at the time that the events or conditions arose that brought the minor within the provisions of Section 300, who desires to assume custody of the minor. If such a parent requests custody the court shall place the minor with the parent unless it finds that placement with that parent would be detrimental to the minor.
"If the court places the minor with such a parent it may do either of the following:
"(1) Order that such parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the minor. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents.
"(2) Order that the parent assume custody subject to the supervision of the juvenile court. In such a case the court may order that reunification services be provided to the parent or guardian from whom the minor is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the minor."
The juvenile court may grant custody to the other parent and terminate its jurisdiction (§ 361.2, subd. (a)(1)) or it may continue its supervision *1496 (§ 361.2, subd. (a)(2)). The discretion afforded the juvenile court in this area appears very broad. The section does not, however, expressly state under what circumstances the court may decide to terminate or continue its jurisdiction. At most, there is an implicit acknowledgement in section 361.2, subdivision (a) that the juvenile court must assess whether there is a need for its supervision.
In section 366.21, subdivision (e), the Legislature has expressed a standard for termination of jurisdiction when the juvenile court has placed a minor with its other parent. This section, however, is only applicable to those children whom the juvenile court made dependents on and after January 1, 1989. (§ 366.21, subd. (j).) As noted above, the juvenile court adjudged Sarah M. a dependent child in 1988.
Section 366.21, subdivision (e) provides in pertinent part:
"If the minor had been placed under court supervision with a previously noncustodial parent pursuant to Section 361.2, the court shall determine whether supervision is still necessary. The court may terminate supervision and transfer permanent custody to that parent, as provided for by paragraph (1) of subdivision (a) of Section 361.2." We find nothing in the section's legislative history which explains the Legislature's purpose in adding this specific language and making it applicable only to post-1988 dependencies.
There is also some case authority for a need-for-supervision standard in deciding whether to terminate jurisdiction. In In re Francecisco (1971) 16 Cal. App.3d 310, 314 [94 Cal. Rptr. 186], cited by mother, the appellate court reasoned jurisdiction continues until the juvenile court "becomes convinced on the evidence that the protection of the minor no longer requires supervision...." As in the present case, the juvenile court in Francecisco had removed the minor from his mother's home, adjudged him a dependent child of the court and placed him with his father. (Id. at p. 313.)
A need-for-supervision standard appears reasonable. While placement of the child with the formerly noncustodial parent may not be detrimental, there may be some concern that: this parent will turn around and relinquish the child to the other parent after the termination order; or this new custodial parent may need services. Also, the formerly noncustodial parent may not want long-term custody. Alternatively, the court may anticipate that with the appropriate reunification services, the child will be able to return to the home of the original custodial parent. It is also possible that, as discussed later in the context of this case, the court may see a need to provide services *1497 short of reunification for the child's best interests. Thus, supervision may be appropriate in lieu of or before terminating jurisdiction.
Actually, mother urges a two-step approach: (1) do conditions still exist which would justify assumption of jurisdiction; and (2) is the continued supervision of the juvenile court still necessary. Her suggestion is a curious one given her earlier argument that section 364 does not apply when the juvenile court has placed a dependent child with a formerly noncustodial parent. However, she now urges section 364 is simply not the sole criterion.
Notably, mother cites no supporting authority for her position. Further, it appears meaningless to do as she suggests. Presumably, the condition(s) which led to dependency no longer exists once the court removes the child from the original custodial parent. By contrast, this is not necessarily the case when the court does not order out-of-home placement.
The other parties do not address the propriety of a need-for-supervision standard. Instead, they advocate the use of section 390 as the standard for termination in this case. Section 390 provides:
"A judge of the juvenile court in which a petition was filed, at any time before the minor reaches the age of 21 years, may dismiss the petition or may set aside the findings and dismiss the petition if the court finds that the interests of justice and the welfare of the minor require the dismissal, and that the parent or guardian of the minor is not in need of treatment or rehabilitation."
There is no case law to date interpreting section 390. The section was derived from section 782[3] (in reference to § 600 proceedings). Section 390, like section 361.2, subdivision (a), appears to grant the juvenile court wide discretion to advance the minor's best interests.
Nevertheless, the words of the statute suggest it is inapplicable to the present case. First, section 390 refers to an order dismissing the petition or setting aside the findings and dismissing the petition. The juvenile court did neither in this case. Second, the section requires findings "that the interests of justice and the welfare of the minor require the dismissal, and that the *1498 parent or guardian of the minor is not in need of treatment or rehabilitation." The juvenile court made no such findings here.
Arguably, this court could imply, from the record, findings that the interests of justice and the child's welfare required the juvenile court's action. However, we could not imply from this record a finding that the parent (mother) was not in need of treatment or rehabilitation.
Respondents argue "the parent" in section 390 is the father in this case and that he did not need help. Respondents' reading of section 390 appears distorted. The section refers to the parent, not a parent. It appears only reasonable to infer "the parent" mentioned in section 390 is the one who was the custodial parent prior to the initiation of the dependency proceedings and whose actions or neglect resulted in the dependency proceedings. Assuming "the parent" in this case was the mother, the record would not support the finding; the underlying theme of this case was the mother's need for further counseling.
We conclude, for the reasons stated above, the juvenile court should have determined whether supervision was still necessary before terminating its jurisdiction. The question then becomes whether there was sufficient evidence to support the termination order on that theory. The mother claims Sarah M. required continued supervision due to visitation problems and the resulting emotional conflict which the child suffered. The other parties disregard this argument.
Unfortunately, the parties did not present any evidence on the issue of termination. The record of the motion to terminate and the subsequent hearing is little more than argument and reliance upon the wrong legal standard, at that. Nevertheless, the material facts on this issue appear to have been undisputed.
Mother contends family strife should have been a basis for continued supervision. She cites in this regard In re Anne P. (1988) 199 Cal. App.3d 183 [244 Cal. Rptr. 490]. That case is so factually distinct from the present case that it is of no help to mother. The juvenile court in Anne P. had adjudged a five-year-old child a dependent under section 300, subdivision (a) in the belief she was suffering from a severe psychological disturbance caused by the unrelenting struggle between her divorced parents. (Id. at pp. 190, 199.) She was "`conflicted, confused, suffering a sense of loss, depression' and had `tremendous unmet needs.'" (Id. at p. 190.) She had also developed a near pathological fear of men. (Id. at p. 191.)
The record here reveals nothing concerning the minor's emotional well-being until July 1989. At that time, the court granted an unopposed motion to *1499 have a licensed therapist evaluate the child to determine if therapy was necessary. The record does not disclose who initially brought the motion or the reason for the motion. A social worker in turn referred the child to Margarita Prado-Borrego, L.C.S.W. At the same time, the father retained Mary McDonald, Ph.D., to also evaluate Sarah.
Prado-Borrego tendered her evaluation in October 1989. According to the father and stepmother, Sarah had appeared troubled after visits with her mother. They blamed the mother and the visits for the reactions Sarah exhibited.[4] However, in watching the mother and child interact, Prado-Borrego observed Sarah "to be quite comfortable and at ease with her mother." The child did not "exhibit any clinical symptomatology during the course of the contact with her mother."
It did appear that those visits supervised by the grandmothers, particularly the paternal grandmother, were very tense. Sarah tended to cry at the end of these visits while there was "minimal emotional reaction from Sarah" after the visits monitored by CPS. Prado-Borrego believed "[o]ne primary issue ... contributing to Sarah's reaction is the tension that exists between Mrs. [M.], paternal grandmother, and [mother]."
The therapist also believed there was a great deal of tension between the parents which might contribute to Sarah's reaction. Each parent was very suspicious of the other, believing the other was trying or would try to alienate Sarah from him or her. The goal was to improve their communication with one another.
In her report, McDonald agreed there was distrust and very poor communication between the parties. She also agreed the grandparents should no longer supervise visitation.
There are no social worker or therapist reports in the record concerning the child's well-being after early October 1989. By the February 1990 hearing, however, it was undisputed that Sarah was doing fine. Mother's counsel represented to the court that the family was making progress. The mother had progressed from supervised to unsupervised visitation twice a week. County counsel agreed they had come "a fair way in the last six months in terms of visitation."
Counsel for the mother nevertheless saw a continued need for parents' conjoint therapy. She claimed that, according to Prado-Borrego, the father *1500 was growing more comfortable with the contact between the mother and child. However, there was "a whole question of trust [which was] being built through this therapy." The problem, according to mother's counsel, was who would bear the counseling cost if the juvenile court terminated its jurisdiction since the mother had no income at the time. CPS had been paying for the psychological services. Mother's counsel also questioned who would order the father to continue therapy if the court terminated jurisdiction.
Thus, at the time of the February 1990 hearing there was arguably no expressed concern about Sarah's well-being. Instead, the issue came down to who would pay for continued conjoint therapy if the juvenile court terminated its jurisdiction. This is not a cry for continued supervision, but rather a plea for financial aid. The juvenile court said as much.[5]
Since Sarah was no longer at risk as of February 1990, she no longer needed the protection of the juvenile court. (See In re William T. (1985) 172 Cal. App.3d 790, 798 [218 Cal. Rptr. 420].) Moreover, if parents' poor communication skills and distrust established a need for its continued supervision, the juvenile court could assume or continue jurisdiction in virtually every family law case involving custody or visitation issues. It would appear the family law court was better suited to handling the issues relating to visitation. This is part and parcel of the family law court's role.
Mother has essentially relied on at least five-month-old evidence to support her claim for further supervision. However, on review of the entire record, there was no need for continued supervision. Thus, the order terminating jurisdiction should not be disturbed.

II. WAS A CUSTODY HEARING REQUIRED?
(3) Next, mother claims the juvenile court should have conducted a custody hearing before it terminated its jurisdiction. She relies on the following language of section 361.2, subdivision (a)(2): "the court may order that ... services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the minor." Mother claims she received reunification services and therefore was entitled to a custody hearing.
Whether the mother was actually receiving services for the purposes of reunification is a separate appellate issue. As discussed in part IV, ante, it *1501 appears she was not receiving such services and therefore was not entitled to a custody hearing. Nevertheless, assuming for the sake of argument the mother received reunification services, there is no record that the court ordered services for the father. Rather, the court ordered the father, at both the first and second review hearings, to provide for Sarah's medical, dental and psychological needs and cooperate with the court's visitation orders.[6] No argument is made, indeed it is difficult to imagine how any argument could be fashioned, that the court's orders for the father amounted to services.
Since section 361.2, subdivision (a)(2) mandates a custody hearing only when the juvenile court orders the provision of reunification services for both parents, it appears on this record the juvenile court acted properly in not conducting a custody hearing.
Mother further argues if this court determines custody was at issue, under section 361.2, subdivision (a)(2), at the termination hearing, then the judgment should be reversed in any event on due process grounds. Mother claims she had no notice that permanent custody was at issue nor was she given the opportunity to be heard. Since the question of custody was not litigated at the termination hearing, we deem it unnecessary to address this additional contention.

III. EFFICACY OF THE "REUNIFICATION" PLAN
Mother also attacks the court's "Reunification/Normalization of Visitation Plan." According to her, once the court ordered the plan, the services contained in it should have been designed for the possible return of the child to her custody. Mother acknowledges the plan was designed only to normalize her visitation with Sarah. We find no abuse of discretion.
(1c) It is undisputed that reunification services, designed to eliminate those conditions resulting in a juvenile court jurisdictional finding, are critical when a child is removed from the home. (In re Rebecca H. (1991) 227 Cal. App.3d 825, 837 [278 Cal. Rptr. 185].) However, such services are not mandated in every case. (See, e.g., § 361.5, subd. (b).) Specifically, as the mother concedes here, when the juvenile court removes a minor from the custodial parent's home and places the child with the formerly noncustodial parent, it is up to the court's discretion whether to order a reunification plan for the parent who has lost custody. (§ 361.2, subd. (a).)
*1502 The mother apparently sees no middle ground between reunification services and no services at all. However, the juvenile court's broad discretion under section 361.2, subdivision (a) arguably gives it the opportunity to attempt to help the parents in creative ways. If the court may terminate outright its jurisdiction and award custody to the former noncustodial parent or go so far as to order services for both parents and reserve the custody question for a later date, we believe the court may also make orders which implicitly acknowledge it will not reunify the child with the original custodial parent and at the same time attempt to help that parent in maintaining or strengthening the contact with the child.
It is undisputed that this is what the juvenile court attempted to do. Given the facts of this case, we hold the juvenile court did not abuse its discretion by ordering services for the purpose of normalizing the contact between the mother and Sarah.

IV. COMPLETION OF THE "REUNIFICATION/NORMALIZATION OF VISITATION PLAN"
Mother also complains the juvenile court abused its discretion by terminating its jurisdiction without permitting her to complete the plan. Again, we find no abuse of discretion.
First, as the mother has already successfully argued, the standard for terminating jurisdiction in a case under section 361.2, subdivision (a), is whether there exists a need for continued supervision. Termination is not conditioned upon the completion of any court services. Mother's argument also raises rather esoteric questions about when the plan is completed: on a date certain, the first time she is able to have overnight visitation, or does some other event act as the cutoff point?
Second, inherent in the mother's argument is her claim that, because she received services, she was entitled to a custody hearing pursuant to section 361.2, subdivision (a)(2). However, as discussed above, she was not entitled to such a hearing.
Third, there was nothing prohibiting her from completing the plan on her own. She did not need a juvenile court order except to the extent that she wanted CPS to pay for the counseling. The father was willing to stipulate to a counseling order under the jurisdiction of the family law court and was also agreeable to maintaining the visitation schedule which the parties had been implementing.
Another judge might have decided to allow the plan to run its course and hopefully enhance the parties' relationship for the sake of child. However, it *1503 was also undisputed that Sarah was doing well and the parties were doing a better job at communicating. Moreover, there was no evidence that Sarah would be at risk if CPS did not continue in its supervisorial role. Therefore, on the record before this court, it does not appear that the juvenile court abused its discretion by terminating jurisdiction before the mother completed the "Reunification/Normalization of Visitation Plan."

V. THE COURT'S FURTHER ORDERS ON TERMINATION
In addition to terminating its jurisdiction and making custody and visitation orders pursuant to section 362.4,[7] the court ordered the following:
"5. The father has agreed to submit himself to the Court's jurisdiction pursuant to Civil Code, Section 4608.1, and the Court orders that he continue in psychotherapy with a psychotherapist of his choice.
"6. The Court orders that the paternity action, Tulare County Superior Court #132336 shall be placed on the Domestic Relations calendar on March 22, 1990, at 8:10 a.m., in Department Number 7 of the above-entitled court for the Court's own motion under Civil Code, Section 4608.1, as to whether to order the mother to participate in counseling and psychotherapy."
Mother contends the court exceeded its jurisdiction under section 362.4 in rendering these orders. The plain meaning of the statute suggests she is correct. The orders in question "determine" neither custody nor visitation. Respondent urges there was no error because the orders "related to" visitation. Assuming the orders did relate to visitation, section 362.4 does not authorize orders relating to visitation.
However, specifically as to the counseling order directed to the father, mother lacks any standing to challenge it. (4) An appellant may contest only such orders which injuriously affect him or her. The appellant cannot urge errors which affect only another party who does not appeal. (Nichols v. *1504 Nichols (1933) 135 Cal. App. 488, 491 [27 P.2d 414].) It boggles the imagination to envision how the court's order compelling the father to pursue psychological counseling could injure the mother.
With regard to the calendaring order, it appears the court at this juncture was not acting as a juvenile court. Rather, the court ordered the hearing in its additional capacity as a family law court.[8] There is no dispute that the superior court also had continuing jurisdiction over the parties by virtue of the paternity action. (5) The moment the juvenile court terminates the dependency proceedings, the child passes completely from the mandatory jurisdiction of the juvenile court, and the jurisdiction of the superior court, including the family law court, is available. (In re William T., supra, 172 Cal. App.3d at p. 799.)
In this instance, Civil Code section 4608.1, subdivision (a), authorizes the family law court to order parents in a custody or visitation dispute to participate in outpatient counseling under certain conditions. Thus, it would appear the court, in order "[t]o provide for the orderly conduct of proceedings before it" (Code Civ. Proc., § 128, subd. (a)(3)), could set the matter for hearing.

DISPOSITION
The order appealed from is affirmed.
Buckley, J., and Brown, (G.A.), J.,[*] concurred.
Appellant's petition for review by the Supreme Court was denied December 12, 1991.
NOTES
[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] Although there is no record of this, it is undisputed the father filed a paternity action soon after the court's placement order. In November 1988, the superior court established his paternity and granted him custody of Sarah.
[3] Section 782 provides:

"A judge of the juvenile court in which a petition was filed, at any time before the minor reaches the age of 21 years, may dismiss the petition or may set aside the findings and dismiss the petition if the court finds that the interests of justice and the welfare of the minor require such dismissal, or if it finds that the minor is not in need of treatment or rehabilitation. The court shall have jurisdiction to order such dismissal or setting aside of the findings and dismissal regardless of whether the minor is, at the time of such order, a ward or dependent child of the court."
[4] There is no clear record in Prado-Borrego's report of what the child's reactions were, other than appearing to be upset and having nightmares. McDonald's report, prepared at roughly the same time, referred to nightmares, clinging behavior, crying, irritability, whining and behavioral regression following visitation.
[5] The judge remarked:

"It seems to me I have read enough of this to know what the issue is. What you're telling me is that if I keep this juvenile case open what happens then the government pays for therapy. If I don't keep it open, no one is going to have any source of funding for therapy."
[6] The father was participating in counseling with the mother. However, there is no record of a juvenile court order requiring his attendance at such sessions.
[7] Section 362.4 provides in pertinent part:

"When the juvenile court terminates its jurisdiction over a minor who has been adjudged a dependent child of the juvenile court prior to the minor's attainment of the age of 18 years, and proceedings for the declaration of the nullity or dissolution of the marriage, or for legal separation, of the minor's parents, or proceedings to establish the paternity of the minor child brought under the Uniform Parentage Act (Part 7 (commencing with Section 7000) of Division 4 of the Civil Code), are pending in the superior court of any county, or an order has been entered with regard to the custody of that minor, the juvenile court on its own motion, may issue an order directed to either of the parents enjoining any action specified in paragraph (2) or (3) of subdivision (a) of Section 4359 of the Civil Code or determining the custody of, or visitation with, the child."
[8] There is some suggestion in the briefing that the dependency and paternity matters were at one point consolidated and that such consolidation plays a role in the resolution of this or other issues on this appeal. It does not. Not only is there no record of any consolidation order in this case, we cannot conceive of any legal basis for consolidation.
[*] Retired Presiding Justice of the Court of Appeal, Fifth District, sitting under assignment by the Chairperson of the Judicial Council.