Filed 10/6/16  In re I.M. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re I.M., a Person Coming Under the Juvenile Court Law. | |
| MADERA COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM B.,<br><br>Defendant and Appellant. | F072820<br><br>(Super. Ct. No. MJP017220)<br><br>**OPINION** |

APPEAL from orders of the Superior Court of Madera County.  Thomas L. Bender, Judge.

Karriem Baker, under appointment by the Court of Appeal, for Defendant and Appellant.

Regina A. Garza, County Counsel, Miranda P. Neal, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

William B. (father) contests the orders continuing dependency jurisdiction of his daughter I.M., now four years old.  We affirm.

## FACTUAL AND PROCEDURAL HISTORY

*First Detention*

In August of 2013, C.M. (mother) and father did not live together.  From the record, it appears that mother was 18 years old and a dependent herself who lived in a foster home placement with I.M.  Mother and father had a previously implemented family court custody order, which apparently consisted of shared custody of I.M.

On August 27, 2013, the Madera County Department of Social Services/Child Welfare Services (department) filed a Welfare and Institutions Code section 300[1] petition on behalf of I.M., alleging father's actions failed to protect I.M. and placed her at substantial risk of physical harm and serious emotional damage.  (§ 300, subds. (b) & (c).)  The detention report alleged father made false allegations against mother in an effort to show she was unfit to care for I.M., including allegations that I.M. was physically and sexually abused and suffered severe ongoing diaper rash while in mother's care.  The department noticed no such injuries on I.M., and that the rashes on the child disappeared while in mother's care.  The department asserted father covertly caused the injuries and rashes in an attempt to make mother look unfit.

Social Worker Mee Wang (SW Wang) had worked with mother since she was a 16-year-old dependent, and she became mother's primary social worker in September of 2012.  SW Wang found mother attentive to I.M.'s needs and she had no safety concerns for I.M. while in mother's care.  SW Wang did not believe father's allegations of mother's abuse against I.M.

---

[1]	All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

Mother reported to SW Wang that she was concerned because, after visits with father, I.M. would not sleep in her own bed, she had nightmares, and woke up screaming. Mother also stated I.M. acted out after father became volatile and verbally abusive at the parents' child exchanges. At the exchanges, with I.M. present, father threatened to harm and kill mother. During one exchange, father drove his vehicle, with I.M. in the car, towards mother to intimidate her and then drove off erratically.

In August of 2013, the department removed I.M. from father's care and placed her with mother.

On August 28, 2013, the juvenile court found a prima facie showing I.M. was a child within the description of section 300, subdivisions (b) and (c). I.M. was ordered to remain in mother's custody, but removed from father's care.

*Jurisdiction*

In the report prepared in anticipation of jurisdiction, the department stated that, during his time with I.M., father took I.M. to the Madera Community Hospital Family Health Services Clinic (the Clinic) rather than her primary care pediatrician, Alfredo Garcia, M.D., where she was prescribed medication that was not reported to mother or Dr. Garcia, placing I.M. at risk of harm. As a result of this conduct, the department filed an amended petition on September 5, 2013, alleging father placed I.M. at risk of suffering serious non-accidental physical harm and failed to protect her. (§ 300, subds. (a) & (b).)

At the contested jurisdiction hearing held September 26 and October 2, 2013, Rojelio Garcia testified that mother, her boyfriend Frankie and I.M. stayed at his place for approximately three weeks. According to Garcia, mother would go to work and leave I.M. with Frankie, who "hit the baby hard" and would "throw the baby in the room with no light, [with a] blanket covering the window, and leave the baby in there until it was time to go get [mother] from work." Garcia claimed Frankie did not change I.M.'s diaper until just before mother came home. Garcia testified that he told mother about Frankie's care of I.M, but mother did not believe him. Garcia told mother and Frankie they needed

3.

to move out because Frankie attacked him at one point. Garcia admitted smoking marijuana with both mother and Frankie when I.M. was present.

Father's mother, D.M. (paternal grandmother), a licensed vocational nurse, testified that the reason she and father took I.M. to the Clinic rather than Dr. Garcia was because of the severity of I.M.'s repeated rash and also because it was a weekend, the only time father had visitation with I.M., and Dr. Garcia was not available. Paternal grandmother informed the doctors treating I.M. that she had a primary care physician, and the Clinic was aware of her other medications. Paternal grandmother also kept mother informed when she took I.M. to the Clinic; the two worked well together in dealing with the rash, which cleared up with proper treatment.

Father denied threatening, fighting, arguing with, or driving his vehicle towards mother during parental exchanges of I.M. Father instead blamed Frankie with trying to start fights with him. Father and I.M. had a restraining order against Frankie, who was to remain a certain distance from them.

On October 7, 2013, the juvenile court ruled the department's allegations had not been proven. The juvenile court found I.M.'s rash, which she had for over a year, occurred while she was in mother's care, and father, with the help of paternal grandmother, did the best he could under the circumstances. The juvenile court found father had not assaulted or threatened mother, and found mother's story "unbelievable." The dependency petition was dismissed.

*Second Detention*

A year later, on October 19, 2014, the department received a referral that mother returned I.M. to father's care with injuries to her face and neck.[2] Father took I.M. to the hospital for treatment. Mother attributed the injuries to I.M. falling out of her toddler

---

[2] Mother now also had a son, S.M., who is not at issue here. We mention him only when necessary for context.

4.

bed, an explanation the hospital social worker found inconsistent with the injuries. I.M. told the social worker mother's current boyfriend, Buddy, hit her in the head and gave her "owies." In addition, marijuana paraphernalia was found within I.M.'s reach at mother's residence. Mother claimed it belonged to Buddy.

On October 19, 2014, the police department issued a temporary restraining order for father and I.M., to protect I.M. from mother due to I.M.'s unexplained injuries. Mother's other child, S.M. was also removed from her care and placed in a foster home. In October, mother tested positive for opiates; Buddy and S.M. both tested positive for marijuana.

On October 22, 2014, the department filed a section 300 petition on behalf of I.M. and S.M. alleging mother failed to protect the children from physical harm. (§ 300, subd. (b).)

On October 23, 2014, the juvenile court found a prima facie showing that I.M. fell within the definition of section 300 and she was ordered to remain in father's custody.

*Jurisdiction*

A jurisdiction hearing was held January 22, 2015, and the juvenile court found the allegations of the petition true. I.M. was declared a dependent of the juvenile court.

*Disposition*

The report filed in anticipation of disposition recommended I.M. be declared a dependent and placed with father, that father receive family maintenance services, and that mother receive reunification services, which would include both participating in coparenting classes.

A contested disposition was held March 26 and April 7, 2015. Paternal grandmother testified that she helped care for I.M. since she was three months old. Paternal grandmother was concerned about I.M.'s well-being while in mother's care due to previous abuse, specifically an incident in 2013 when I.M. was 17 months old, an incident in June of 2014, and the current incident in October of 2014. The incident in

June of 2014 was described as I.M. returning from a visit badly bruised. Paternal grandmother and father called the police, who came and took pictures and said they would forward them to Child Protective Services (CPS), but CPS did not follow up with them. According to paternal grandmother, had mother and father not exchanged I.M., the abuse while in mother's care would not have been reported.

Father testified that I.M. had suffered no injuries while in his care, except she bumped a table and got a minor bruise. In response, father called CPS and took her to the hospital. Father testified that when he took I.M. to visit mother, her boyfriend Buddy, her friend Chris, and former boyfriend Frankie had all threatened and harassed him.

Social Worker Shanekka Brown-Johnson (SW Johnson) testified she was mother's social worker when she was a dependent and had known her for several years. Three or four other social workers had worked with mother when she was a dependent as well. SW Johnson was assigned the case involving mother and both children in early 2015. SW Johnson was not aware of the abuse that allegedly occurred in June of 2014, nor was it investigated, as there was no referral made on it. SW Johnson recommended mother receive "reunification style" services and father receive family maintenance services because I.M. was attached to both parents. SW Johnson stated that, in the limited time she had supervised visits between mother and I.M., mother's interaction with I.M. was "very appropriate."

On April 30, 2015, the juvenile court ruled on the matter, stating it knew mother because she was a dependent and it knew "the whole history between mother and [father]." The juvenile court did not think mother abused I.M., but also did not think mother protected I.M. from "the abusers." The juvenile court considered various options and, after argument, adjudged I.M. a dependent, placed her with father, and ordered father be given family maintenance services. As for mother, the juvenile court granted supervised visitation and ordered "some services … [b]ut not services designated to reunify or place [I.M.] back with mom." A three-month review hearing was set.

6.

*Family Maintenance Review*

On August 7, 2015, the department filed a status review report in anticipation of a section 364 family maintenance review hearing. The report stated father was employed, I.M. was current on her immunizations, she had no outstanding medical or dental issues, and she was developmentally on target. Father and mother were participating in coparenting classes. The class instructor provided an update stating mother was participating in class and completed her homework. Father had not completed the majority of his homework and was disruptive and inattentive in class. On July 30, 2015, the instructor stated that, if father's behavior continued, he would be dropped from the class.

The department recommended I.M. remain a dependent, that father continue to receive family maintenance services, and mother continue to receive family reunification services.[3]

*Contested Maintenance Review Hearing*

A contested three-month maintenance review hearing was held September 24, 2015, and continued numerous times. Social Worker Micky Vang (SW Vang), who had been assigned the case three months earlier, testified I.M. was "very, very close" to father and the two had a "good and strong bond and relationship with one another." Father was currently employed full time and paternal grandmother supervised I.M. while father worked.

SW Vang testified she recently received a positive report from the coparenting class instructor regarding father's class performance. Father completed the department's program, including all of his classes and counseling. According to SW Vang, father achieved the goals set out for him in the department's case plan; he demonstrated

---

[3]    At disposition, the juvenile court had specifically stated that the services mother was to receive were not for reunification purposes.

adequate parenting skills to ensure I.M.'s well-being and safety; he understood and met I.M.'s individual needs; and he ensured I.M. was consistently taken to her medical appointments. Based on SW Vang's home visits with father, she had no concerns for I.M. in father's care. In addition, I.M. had "tremendous" family support in father's home.

SW Vang arranged visits for I.M. between mother and father, and she described paternal grandmother as very helpful in facilitating the visits. Paternal grandmother and father were flexible and willing to change hours and days of visits, but mother still missed several visits. Although SW Vang had not personally witnessed any conflicts between mother and father in the relatively short time she was assigned the case, she recommended services be continued for both mother and father in order to "build better communication" between the two so they could better serve I.M. SW Vang opined it would be detrimental to I.M. to dismiss the case at this point.

SW Vang testified the department wanted mother to have unsupervised visitation before recommending dismissal of dependency. However, the department had ongoing concerns about mother's boyfriend Buddy's substance abuse. In June of 2015, while mother's son S.M. was a dependent, both S.M. and Buddy tested positive for methamphetamine. Mother also tested positive for opiates during this same time period. SW Vang was not certain whether mother had a prescription causing the test results.

The coparenting class instructor testified father actively participated in class and shared experiences relevant to the course material. While mother and father did not want to work together at first, they had been working together during family activities. The instructor testified that I.M. participated in the program with both parents, and she did not see any negative behavior, conflict or arguments between mother and father that would negatively impact the child. Father participated in all 14 class sessions; mother missed two or three sessions, but was able to make up the missed course work.

Paternal grandmother testified I.M. and father had been living with her, her husband and daughter permanently since October 2014. If dependency jurisdiction was

terminated for I.M., paternal grandmother was willing to supervise visits between mother and I.M., as she had done in the past.

Father's counsel argued the juvenile court should terminate dependency over I.M. and order full custody to father because the department failed to establish that the conditions which brought I.M. under dependency jurisdiction were likely to exist if supervision was withdrawn.

On October 19, 2015, in explaining its tentative ruling to continue dependency, the juvenile court stated it had reviewed the case from the beginning and was "pretty familiar with it." It then expressed its concerns, stating:

> "Going back to 2013 when all that business is going on with [I.M.], one thing I took away from that is that the parents were not working together very well. And that actually continued from the very beginning. I know that there was later allegations in 2014 – and let me just find something in my notes. Dr. Garcia[4] made a statement, it's in one of the reports, that he was tired of the parents accusing each other of abusing [I.M.]. And his opinion was that neither parent should have custody of [I.M.]. So I mean, when I come to my own opinion that the parents were not, you know, co-parenting very well, I don't think it's just my opinion. Pretty much that opinion was shared by others including Dr. Garcia, so I have reviewed the entire case …. Dad has custody, mom has supervised visits at [the department]. They have completed services. They completed the co-parenting class. You know, honestly, it's kind of disappointing to me that after all this time, going back to 2013 that the co-parenting class completion of that was not very stellar, lack of a better word. In other words, dad, you know, he had to be encouraged to do his homework, get off his phone.
>
> "There was testimony regarding how the parents were interacting. I mean, sure they completed it. I don't know if they learned anything from it, quite honestly. And where are we today? We are still at supervised visits at the Department. They haven't even had a visit outside of the Department. I haven't heard a plan for how they are going to do exchanges, how they will cover medical information, haven't heard any of

---

**4**      The child's pediatrician.

that.  And I am really afraid based on the history of the case it will end up right where we were, beginning.

"I agree with [mother's counsel].  I remember what he told me before we continued the case is that these parents were young.  They haven't gotten to the point where they need to be and I agree with that after I reviewed the case on my own.…  I think honestly that if I were to dismiss it today it's likely that these things, they're going to continue. So I am inclined to follow the recommendation … the recommendation is to continue [family maintenance].  It doesn't necessarily have to be six months.  I can set a six-month and three-month review.  I want to see … a plan for supervised visits perhaps maybe working into unsupervised.  I don't know if that is going to be possible because of mom's situation .…  I want to see you guys co-parent.  That means you guys will have to put down whatever issues you have, any ill will if you want to call it that, bury that stuff and have to agree … to talk to each other and do it in a responsible way to raise up [I.M.].  You don't have a choice, you will have to do that.  And you will have to act appropriately towards each other."

Father's counsel argued to terminate dependency, stating there was no safety issue as to I.M. while in father's care and as long as mother continued to have supervised visits.  In essence, father's counsel argued it was not "fair to hold the father responsible for mother's bad choices and in the meantime he is having to continue to come to court."

After a number of continuances, on November 19, 2015, the juvenile court continued both dependency jurisdiction and family maintenance services for father.[5] Father appeals from the status review hearing orders.

## DISCUSSION

Father contends the order continuing jurisdiction was an abuse of the juvenile court's discretion.  In order to understand father's argument, we first summarize the applicable statutes.

---

[5]     Because of the numerous continuances, the findings and order after hearing filed on November 19, 2015, refers to the hearing as a six-month review hearing and a 12-month permanency hearing was set for April of 2016.

        *A. Statutes Governing Placement of the Child at Disposition*

Once the juvenile court has assumed jurisdiction, the court must hold a disposition hearing to determine, among other things, an appropriate placement for the child. The court generally has three choices. First, if the court determines the child would not be at substantial risk of physical or emotional harm if left in the custody of the offending parent or parents, the court may leave the child in parental custody and "order family maintenance services to ameliorate the conditions that made the child subject to the court's jurisdiction." (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 302; see § 362, subd. (c).)

If, however, the court determines the child would be at substantial risk of physical or emotional harm if left in parental custody, section 361.2 requires the court to "determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child." (§ 361.2, subd. (a).) If such a parent exists—referred to as the "noncustodial" parent—the court is then required to place the child with that parent unless if finds that doing so would be detrimental to the physical or emotional well-being of the child.

If the court places the child with a noncustodial parent under section 361.2, subdivision (a), it has the option to either terminate jurisdiction with a custody order in favor of the noncustodial parent or retain jurisdiction and order services to either or both parents. The first option is set forth in section 361.2, subdivision (b)(1), which states: If the court places the child with a noncustodial parent, it may "[o]rder that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the [parent from whom the child was removed]. The court shall then terminate its jurisdiction over the child. The custody order shall continue unless modified

by a subsequent order of the superior court.  The order of the juvenile court shall be filed in any domestic relation proceeding between the parents."

The second option is set forth in section 361.2, subdivision (b)(3)[6], which states: If the court places the child with a noncustodial parent, it may "[o]rder that the parent assume custody subject to the supervision of the juvenile court. In that case the court may order that reunification services be provided to the parent ... from whom the child is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child."

Finally, if the court determines removal from parental custody is necessary and there is no noncustodial parent willing to assume custody, the court must order the child under the supervision of the social worker, who is then responsible for selecting an appropriate out-of-home placement. (See § 361.2, subd. (e).)

*B. Six-month Review Hearing*

"If a child has been declared a dependent of the juvenile court and placed under court supervision, the status of the child must be reviewed every six months." (*Bridget A. v. Superior Court, supra,* 148 Cal.App.4th at p. 303.)  The applicable standards at the six-month review hearing differ depending on the child's placement.

Section 364 governs when "a child under the supervision of the juvenile court ... is not removed from the physical custody of his or her parent or guardian ...." (§ 364, subd. (a).)  At a section 364 six-month review hearing, the court is required to "determine whether continued supervision is necessary." (§ 364, subd. (c).)  Termination of

---

**6**     Section 361.2, subdivision (b)(2) provides the court a third option that is not relevant here.

jurisdiction is required "unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (*Ibid.*)

Section 366.21, subdivision (e) governs when a child has been removed from the custody of a parent. If the child has been placed in out-of-home care, section 366.21, subdivision (e)(1) requires the court to return the child to parental custody at the six-month hearing unless the social worker establishes "by a preponderance of the evidence that the return of the child to his or her parent ... would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

The statute also includes a separate paragraph describing the procedures used at a six-month review hearing for a child who was removed from a custodial parent and placed with a noncustodial parent pursuant to section 361.2: "If the child had been placed under court supervision with a previously noncustodial parent pursuant to Section 361.2, the court shall determine whether supervision is still necessary. The court may terminate supervision and transfer permanent custody to that parent, as provided for by paragraph (1) of subdivision (b) of Section 361.2." (§ 366.21, subd. (e)(6).)

Thus, under section 366.21, subdivision (e)(6), the standard applicable to a six-month review hearing for a child placed with a noncustodial parent is similar to the standard applicable to a section 364 six-month review hearing for a child who was not removed from a custodial parent. In both instances, the court must "determine whether continued supervision is necessary." (§ 364, subd. (c); see also § 366.21, subd. (e)(6) ["whether supervision is still necessary"].) But, under section 364, subdivision (c), the court must also determine whether the conditions first establishing jurisdiction still exist, a requirement not included under section 366.21, subdivision (e)(6). (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1451.) "When deciding whether to terminate jurisdiction [over a child placed with a noncustodial parent], the court must determine whether there

is a need for continued supervision, not whether the conditions that justified taking jurisdiction in the first place still exist, as required under section 364." (*Id.* at p. 1451; see also *In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1497 [when deciding whether to terminate jurisdiction over a child placed with noncustodial parent, juvenile court is not required to inquire whether conditions that originally supported jurisdiction still exist], disapproved on other grounds in *In re Chantal S.* (1996) 13 Cal.4th 196, 204.)

*Analysis*

At the disposition hearing, the juvenile court ordered I.M. removed from mother's physical custody and placed with father. At issue here is whether the review hearing is held under the standards of section 364, subdivision (c) or section 366.21, subdivision (e)(6). The question hinges on whether father is considered a custodial or noncustodial parent.

Father claims he was a "custodial" rather than "non-custodial" parent because I.M. resided with him when she suffered non-accidental injuries caused by mother, which gave rise to the dependency jurisdiction. Father argues the more onerous statute, section 364, subdivision (c), was applicable and required the additional determination by a preponderance of the evidence that the conditions that triggered jurisdiction still existed. According to father, since those conditions no longer existed, jurisdiction should have been dismissed.

We disagree with father, and find section 366.21, subdivision (e)(6) applicable here. Mother and father shared a previously implemented custody order, so it can be argued that neither parent was, per se, the "noncustodial" parent as described in section 361.2, subdivision (a). However, the parent who has physical custody of the child at the time of the events that gave rise to the petition, here mother, "is often referred to as the 'custodial parent.'" (*In re Adrianna P.* (2008) 166 Cal.App.4th 44, 55, fn. 5.) That would make father the "noncustodial" parent in this case, and the juvenile court was required only to determine whether its supervision was still necessary in order to continue

14.

dependency, not whether the conditions which justified initial assumption of jurisdiction still existed.

Our task is then to determine whether there was sufficient evidence to support the juvenile court's order continuing dependency due to the need for continued supervision. (*In re Sarah M., supra,* 233 Cal.App.3d at p. 1498.)  The record supports the juvenile court's ruling.  While both parents clearly loved I.M., they were still not able to adequately coparent I.M.  As noted by the juvenile court, trigger issues of parent exchanges and how to manage medical information had still not been discussed.  The juvenile court's concern that the situation could easily regress to the way it had been at the "beginning" is evident from the record before it.

**DISPOSITION**

The orders are affirmed.

_____

FRANSON, J.

WE CONCUR:


_____

HILL, P.J.


_____

McCABE, J.*

---

\*      Judge of the Merced Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.