Filed 12/14/15  In re Austin L. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re AUSTIN L., a Person Coming Under the Juvenile Court Law. | D067868 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., Plaintiffs and Respondents, v. SCOTT L., Defendant and Appellant. | (San Diego County Super. Ct. No. EJ3867) |

APPEAL from orders and a judgment of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Emily K. Harlan, Deputy County Counsel, for Plaintiff and Respondent San Diego County Health and Human Services Agency.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Plaintiff and Respondent Heather B.

In early January 2015, then-eight-year-old Austin L. was removed from his father Scott L. (the father) and taken into protective custody after the father's girlfriend reported the father had assaulted her. At the contested disposition hearing in this child dependency case, the juvenile court awarded sole custody to Austin's mother, Heather B. (the mother), in Las Vegas, Nevada, and terminated its jurisdiction.

On appeal, the father contends (1) the court committed reversible error in awarding legal and physical custody of Austin to the mother, and (2) the court "erred in terminating its jurisdiction over Austin in light of the risks to Austin evident in [his] mother's home." We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Austin's mother met his father when she was 20 years old, and they began living together shortly thereafter. According to the mother, when she met the father, he had recently been released from jail after spending five years in custody for drunk driving and crashing cars.

According to the father, he began drinking, using drugs, and engaging in criminal activity as a young teenager after his mother died. The father told Rachel Swaykos—the social worker assigned to Austin's San Diego dependency case at issue here—that he stopped all substance abuse at the age of 15, but records revealed he had been arrested and convicted of alcohol- and drug-related offenses as an adult.

2

The father has an extensive criminal history. The San Diego Health and Human Services Agency (Agency) report on his criminal history indicated he was arrested and charged 25 times between 1995 and 2015 in the states of Wisconsin, Pennsylvania, Illinois, Utah, Arizona, Nevada, and California. He was listed as an armed and dangerous "Wanted Person" who had failed to appear in court on larceny charges in Illinois.

The mother also has a history of drug use and criminal activity. She began using marijuana recreationally when she was a teenager. As a young adult, she began using marijuana for pain management after she sustained a knee injury and four spinal compression fractures in a horse accident during her last year of high school. Her criminal history includes three prior arrests for domestic violence-related charges in May and November 2000 and October 2009. She was also charged in October 2009 in Utah with neglect of a child and contributing to the delinquency of a minor by permitting the minor to consume alcohol, but those charges were dismissed without prejudice. Following her most recent arrest in June 2011, the mother was convicted of disorderly conduct and sentenced to probation, and charges for theft and assault were dismissed without prejudice.

In 2006 the mother gave birth to Austin, who was her and the father's first child. Shortly thereafter she became pregnant with their second child, a daughter. The father was incarcerated when she was born. She has resided with the mother in Las Vegas, Nevada for the past several years, and is not a subject of this appeal.

3

A. *Austin's January 2015 Protective Custody*

On January 2, 2015, when Austin was eight years old, the Agency received a referral to check on Austin's welfare after his father had engaged in domestic violence with his girlfriend, Heather W.,[1] the previous night. The father and Heather had been drinking alcohol and arguing during the night before their arguing culminated in a physical altercation. The father was arrested for felony spousal abuse.

Austin told the investigating social worker that his father and Heather drank a lot of alcohol. Austin said he had seen the father hit Heather and the violence made Austin feel sad. Austin reported he did not want to be with his mother and preferred to be with his paternal aunt.

Heather told the investigating social worker that she and the father had been drinking on the night of the incident when he began calling her names and calling her crazy. She went to bed to stop the arguing, but the father followed her, punched her twice in the back of the head, and pulled the string of her hoodie so tight she could not breathe. The social worker observed faint bruising on Heather's jaw line and neck. Heather told her she was afraid to talk to the police, and she was afraid of the father. Heather said she had already arranged for Austin's paternal aunt, who lived in Arizona, to pick Austin up because she believed the father would never leave her alone if she had Austin in her care.

---

[1] Because Austin's mother's first name is also Heather and we refer to her as "the mother," we shall refer to the father's girlfriend as Heather.

On January 3, 2015, the mother was informed of the father's arrest and the plan for Austin to be cared for by the paternal aunt. The mother would not allow Austin to be released to the paternal aunt, and the police were unable to release Austin to the mother because she lived out-of-state. Austin told the police he was afraid of the mother. San Diego police officers transported Austin to Polinsky Children's Center (PCC) that same day. The father denied the alcohol abuse and domestic violence allegations.

An Agency social worker interviewed the mother on January 5, 2015. She reported the father had been keeping Austin away from her for the past year and a half. She also reported she had some contact with Austin on the phone and on Facebook, but the father would dictate what Austin could say to her. The mother reported she had been living in Las Vegas with her fiancé, Larry R., for about two years. She and Larry had a good relationship, but Austin barely knew Larry. The mother also reported she had a stable home life and she wanted to care for Austin due to the father's history of violence and drug abuse. She initially denied any drug history or current drug use of her own. After she was asked to drug test, she admitted using marijuana for medicinal purposes, though she did not have a medical marijuana card at the time.

Social worker Swaykos and another Agency social worker contacted the paternal aunt in early January 2015. The aunt did not believe either parent should have custody of Austin or his sister because of the father's "violent streak" and the mother's "issues" with her boyfriend. The paternal aunt explained that she used to live with the mother and Larry, and it was not a good "emotional environment" because Larry yelled, came in and out of the home, and had a temper that led him to punch holes in the walls. She denied

5

that Larry had ever been physical with the mother, and she indicated she would like to obtain guardianship of Austin due to the parents' behaviors. She hoped Austin would return to the mother's care when it was a "better environment" for him because the mother was a "good mother" when she was by herself. The paternal aunt denied knowing about any drug use by the mother or Larry, and she reported she had not lived in the home since Spring 2014.

On January 5, 2015, Austin had a supervised visit with his mother at PCC. The Agency social worker reported Austin initially was "very guarded," but after the visit he said he was happy to see his mother and visit with her at PCC. When asked where he would like to go when he left PCC, Austin said he wanted to go with his father or, if that were not possible, with his paternal aunt. He added he would rather go with his aunt. Austin said he was not scared of his mother, and he was not worried about being with her. However, he said he did not want to go with her.

B. *Dependency Petition*

The Agency thereafter filed a dependency petition on behalf of then-eight-year-old Austin. The petition alleged that Austin was a child described by Welfare and Institutions Code[2] section 300, subdivision (b), because he had suffered or was at risk of suffering serious physical harm or illness due to his parent's failure or inability to adequately supervise or protect him. Specifically, the petition alleged Austin was exposed to violent confrontations between the father and Heather, and the father had a

_____

2      All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

6

prior history of violence, substance abuse, and failure to reunify with his children during the prior dependency case in Utah. The petition also alleged Austin was a child described by section 300, subdivision (g), because he had been left without any provision for support in that the mother returned him to the father's care, and the father was incarcerated and unable to arrange appropriate and adequate care.

C. *Detention Hearing*

In its detention report, the Agency advised the court that its investigation into the parents' history disclosed "investigations and cases for both parents in several states." The mother had a history of physically abusing Austin in Illinois in 2008, leaving cuts, bruises, and welts on him before he was two years old. Both Austin and his sister were removed from the parents in Utah in 2009 following domestic violence, substance abuse, and "inappropriate relationships with minors." The Utah court returned Austin and his sister to the mother's care in September 2011 and ordered them to "work out custody and visitation." Mother immediately gave Austin to father when he was released from a correctional facility.

The Agency reported that on January 5, 2015, the mother requested custody of Austin, but the Agency declined to recommend placement with her, and instead recommended that all of her contact with Austin be supervised until she could show she maintained a stable residence free of drug use and volatile altercations. The mother's relationship with her boyfriend was potentially volatile, and she was using marijuana. Austin told the social worker he did not want to live with the mother and preferred to be placed with his paternal aunt.

7

At the detention hearing, the court found a prima facie showing had been established that Austin was a person described in section 300, subdivisions (b) and (g). The court ordered Austin detained at the PCC, in an approved foster care home, or an adjunct. The court gave the Agency discretion to detain Austin in the home of an approved relative or nonrelative extended family member (NREFM). The court ordered supervised visitation for both parents.

D. *Contested Jurisdiction and Disposition Proceedings and Austin's Placement With His Mother in Las Vegas*

In late February 2015, the court held a contested jurisdiction and disposition hearing. Only the father contested the Agency's recommendation that Austin be placed with the mother.

The court received into evidence all of the Agency's reports to date along with social worker Swaykos's curriculum vitae. Swaykos testified she had been a social worker with the County of San Diego since 2008, she had received specific training in assessing whether children are at risk in the custody of their parents, and she generally conducted ongoing risk assessments on that issue after she was assigned to a particular case. She was assigned to Austin's case shortly before the detention hearing. !4RT 4:25-28)!

Swaykos also testified about the sources she consulted and the basis for her final recommendation that Austin be placed with his mother and that the court terminate jurisdiction. She acknowledged that the mother's history could indicate risk. However, she stated that "when we're looking at current safety factors and we're looking at what

8

have we done, what is going on in the home at this minute, we don't have the evidence to indicate that he would be harmed now if placed there right now."

On cross-examination by the father's counsel, Swaykos acknowledged she had not yet received documentation requested from the mother's boyfriend's (Larry's) doctors. She also acknowledged that Larry had not submitted to a drug test, and the mother had not submitted to a drug test since she returned to Las Vegas.

Austin's counsel asked Swaykos whether she considered asking for an evaluation under the Interstate Compact on the Placement of Children (ICPC) (discussed, *post*) so that the case could stay open for services after Austin moved to Nevada. Swaykos answered that she considered it, but she believed she would need to make a showing of current detriment to justify that request. She concluded that the results of the investigations she and the Las Vegas social workers conducted did not show a current risk of detriment to Austin if he were placed in the mother's custody.

Upon questioning by the court, Swaykos testified that the mother was currently using marijuana under a medical prescription. She added that she could not say the mother should not be using marijuana unless there were indications that she was abusing it. Swaykos agreed that, as a social worker, she often found that people who used marijuana used other drugs as well, but there were no indications the mother was using any other drugs. She testified that a parent's use of marijuana under a doctor's guidance did not necessarily pose a risk to the child unless it impacted the parenting or otherwise had an impact on the child.

9

On recross-examination by the father's counsel, Swaykos acknowledged that a parent's use of marijuana after completion of a substance abuse treatment program was considered a relapse.

With respect to Larry's methadone use, Swaykos testified that because she initially was concerned he had been on methadone for 10 years, she pulled information on his "calls for service"[3] and his criminal history to determine whether there were indications he was abusing as opposed to just using the drug. She testified she found none of the usual indicators of drug abuse such as drug charges, violence charges, or police coming out to the home, but she acknowledged Larry admitted to smoking marijuana without a medical marijuana card.

Swaykos also testified that Austin never gave a specific reason why he initially did not want to live with his mother. All of the adults involved in the case had a different theory as to why Austin made those initial statements. Swaykos believed that Austin's wishes had changed after he was given an opportunity to ease back into his relationship with his mother when she came to San Diego. He had also been talking more to his sister and he definitely wanted to be with her. Swaykos believed Austin's primary motivation for wanting to move was to be with his sister.

Swaykos further testified she had spoken to the mother about her previous decision to give Austin to his father after the Utah dependency case closed. Swaykos stated the mother felt "like she got burned the last time," and she said she would not give

---

3    County Counsel asserts that "'calls for service' is a term commonly used by social workers to refer to a list of police contacts at a particular person's address."

Austin back again this time. The court then asked Swaykos her opinion as to whether she thought the mother would give Austin back to the father if she were stressed out and Austin was acting out. Swaykos initially responded that she did not know, but then testified she "would not give [her] guarantee" that the mother would never return Austin to the father. Swaykos acknowledged that Austin had some "behavior concerns" and he had never met Larry, who appeared to have some anger issues as well as pain medication dependency. She testified that Austin's behavioral concerns included being chauvinistic and demanding, wetting himself, and sometimes throwing tantrums. Austin's behavioral issues had decreased after he returned to PCC from the NREFM caregiver's home. Swaykos acknowledged it was possible Austin might have some adjustment issues if he were placed with the mother and Larry.

Swaykos testified there were several alternative dispositions available if Austin were not placed with the mother. She was concerned, however, that the negative behaviors Austin displayed in the NREFM's home might resurface in an unfamiliar foster home, which could result in his eventual placement in a group home.

On recross-examination by the father's counsel, Swaykos testified she would ask the court to keep the case open for monitoring if the mother lived in San Diego. However, she indicated she was satisfied the Las Vegas social worker had adequately investigated the most recent referral for the mother's home. She also indicated she could not recommend keeping a case open without the means for continued supervision. Swaykos further testified that an ICPC was necessary in order to obtain that supervision

11

from another state. She could not go to Las Vegas to see Austin because she was not permitted to practice social work in another state.

In his case-in-chief, the father testified on his own behalf. The court received into evidence an eight-page packet of visitation narratives from PCC. The father testified he did not agree with the recommendation that Austin be placed with the mother because he knew from "personal history" it would be a "horrible place" for Austin to go "especially where Austin is at right now mentally." The father testified he was always the one to handle situations with the children in a healthy, positive way and that he had "done it from day one." He testified the mother was always in conflict with Austin, and that was one of the reasons she wanted to split the children up. The father did not believe the mother would take care of the children and stated there was "a big worry" with the drug use. He was concerned about Larry.

The father also testified the mother had allowed him some contact over the telephone with the daughter, but the mother would dictate to her what she should say during the conversations. The mother had blocked him on Facebook and made excuses not to talk to him when he tried to contact her or find her location. He testified he was worried the same things would happen with his contact with Austin if he were placed with the mother.

On cross-examination, the father testified he had not attempted to obtain a custody order allowing him visitation with the daughter, but her planned to do so. He started the process in 2012, but he was not able to obtain a custody or a visitation order because of

12

"circumstances that happened" such as his inability to stabilize his life within a certain amount of time.

Regarding the allegations in Austin's petition, the father denied he was ever physically violent with Heather or any other woman. He also denied having any prior convictions for domestic violence. He added there was only one domestic violence case against him involving the mother and the children when they lived in Utah. He acknowledged he had a drinking problem and stated the last time he drank alcohol was the night of the incident with Heather. During closing arguments, the Agency's trial counsel asked the court to make a true finding on the petition and to continue the disposition portion of the hearing so that Austin could go on a short trial visit with the mother. Austin's counsel joined in the Agency's request.

During closing arguments, the father's counsel asked for dismissal of the petition. Alternatively, he requested several different dispositional orders that did not include placement with the mother. With respect to the continuance request for a trial visit with the mother, the father's counsel argued the concerns about the mother were "not going to change a month from now." The father asked for joint legal custody in the event the court declined his requests.

The court made a true jurisdictional finding on the petition under section 300, subdivision (b) by clear and convincing evidence. The court found the father was not a credible witness, stating he was "not telling the truth." Regarding disposition, the court found that exceptional circumstances existed to continue the dispositional proceedings beyond the usual 60-day time period under section 352. The court noted that Swaykos

13

was an excellent social worker, and the court trusted her assessment abilities. However, the court also found from his questioning of her that Swaykos was "a little bit concerned."

The court acknowledged the many positive elements of the potential placement with the mother, but pointed out the mother had a very long drug history and an unstable lifestyle. The court's concerns about drug abuse in the home were not alleviated by the mother's possession of a medical marijuana card. The court was also concerned about the family's tendency to move when they got into trouble. The court was also concerned about Larry's circumstances and about adding an eight-year-old child to the household dynamic.

The court then indicated it would allow Austin to visit his mother in Las Vegas because of "the positives of this case." The court stated that "one real strong argument for the Agency's recommendations" was that Austin's sister was living in the mother's home without any apparent issues. The court added, "Again, it's the history that concerns me. Is it a ticking time bomb?"

The court ordered weekly random drug testing for the mother and authorized Austin to travel to Las Vegas and back to San Diego, accompanied by a social worker. For the continued contested disposition hearing, the juvenile court requested more information on drug test results for the mother.

1. *Continued contested disposition hearing*

The Agency submitted an addendum report prepared by social worker Swaykos for the March 27, 2015 contested disposition hearing with additional updates and

information.  Swaykos spoke with Larry about his child welfare agency involvement with his daughter, and Larry reported his daughter was in the care of the court because she was a runaway and did not want to live with him.  He was reluctant to share any additional information over the phone with somebody he did not know.  After Swaykos spoke with the current social worker assigned to Larry's daughter's case, and after she reviewed the records, she had no additional concerns and she determined Larry's version of events was accurate.

Swaykos also reported that she received Larry's medical records from the doctor's office where he was being seen for pain management.  The records indicated he had been prescribed methadone since September 2013 for lower back pain as well as another medication for anxiety and depression.  Larry became anxious and depressed when his teenage daughter ran away and did not want to live with him.  The records also showed Larry was not "doctor hopping."  He had previously tried another prescription medication for the pain, but he could not afford it due to lack of insurance.  Swaykos also reported that Larry was drug tested and his results were positive for methadone and THC.

The Agency set up drug testing for the mother in Nevada.  The mother agreed to pay for the test out-of-pocket until the Agency could reimburse her.  On March 20, 2015, the mother tested positive for THC.

The Agency reported that as of March 23, 2015, the father had only participated in three domestic violence classes.  According to the group session facilitator, the father believed he did not do anything and said, "'[T]his whole thing is a joke.'"  The father had

only recently begun to participate in the sessions, and he was not yet successfully enrolled in substance abuse treatment.

Swaykos reported that Austin had flown to the mother's home accompanied by a social worker on March 1, 2015. On March 24, 2015, Austin was returned to PCC in San Diego pending the outcome of the trial.

The mother reported that during Austin's visit things went well in school, at home, and with Larry. When Austin demonstrated behavioral issues in school similar to his behaviors at school in San Diego, the mother implemented incentives in the home including no television or video games until his homework was complete.

Swaykos also reported that she spoke with Austin's new teacher. During Austin's first three weeks in class, his behavior appeared to follow a pattern of two good days and then two "not good" days. The teacher stated that Austin was struggling to catch up and to control his behavior, but she thought he was "'an awesome kid.'" She implemented incentives as discipline after she noticed that being stern with Austin escalated his negative behaviors. Austin responded well to compliments and a behavior chart in the classroom.

Austin's teacher also reported the mother asked her daily about Austin's behavior and demonstrated a willingness to implement behavior management changes and incentives at home. The teacher believed the mother was "'fully responsive'" to her suggestions. She did not see any indications of abuse. Larry picked up Austin from school on two occasions during the trial visit. He participated in the daily check-in with Austin's teacher, and the teacher believed Larry was as invested and caring as the mother.

16

According to the teacher, Larry seemed "like a nice young man," and Austin had not said anything about Larry to her.

On the flight back to California, Austin told the social worker his visit with his mother was great. His favorite part was riding horses. When asked how things were at his mother's house, Austin replied they were "good" and "fun." He enjoyed playing video games with his mother and sister. Austin reported he and Larry spent time in the garage watching television, and Larry took care of him at night while his mother was working. According to Austin, Larry was "an okay guy." Austin also said he liked his new school and his new teacher, he had made friends at school, and they played together and told jokes.

When he was asked whether there was anything he did not like, Austin said no. When asked whether he spoke with his father while he was on the visit, Austin replied he did and it was "good." When asked how things went with his sister, Austin replied the visit was "great" and he had a bunk bed in the same room with her.

Swaykos met with Austin at PCC. Austin confirmed he had a good, fun visit at his mother's home, and he liked his new school and teacher. Everyone was nice to each other, and there was no fighting or yelling during the visit. He reported that when he got in trouble at the mother's home, the mother would take away video games or put him in time out. Larry did not discipline him during the visit. When asked whether anyone smoked in the home, Austin responded that the mother and Larry smoked outside. He said he and his sister played inside while the mother and Larry smoked outside. Austin reported that he did not see the mother or Larry acting differently after they smoked.

17

Austin did see the mother and Larry drinking alcohol, but told Swaykos they only drank "one, not like two, three, four, five six, whole big ones like Dad." The mother and Larry did not act differently or fight after they had a drink like at the father's home. Austin said he felt safe in the mother's home, and he was not worried about anything there.

Swaykos asked Austin whether he wanted to live with his father, his mother, or in a foster home at that time. Austin replied, "[T]hat's a hard choice." He told her he would choose either the mother's home or a foster home. He would only choose a foster home if they were "'really really rich'" with lots of money. If not, he wanted to live with the mother. He also said he would not need a social worker to check on him and his sister to keep him safe at his mother's home.

The Agency continued to recommend that Austin be placed with the mother and that the court terminate jurisdiction. Although the mother's history presented "many risk factors," her current circumstances indicated no safety concerns during the previous past year. Austin stated that he had chosen to live with his mother, and the Agency concluded that both the mother and Austin knew how to reach out for assistance if the mother were to have trouble caring for Austin or if Austin was feeling unsafe.

The court admitted the Agency's March 27 addendum report into evidence along with the evidence previously received at the contested hearing conducted on February 27, 2015.

Austin's counsel supported the Agency's recommendation that Austin be placed with his mother in Las Vegas.

18

a. *Court's findings and orders*

At the conclusion of the contested hearing, the court ordered Austin removed from the father's custody pursuant to section 361, subdivision (c)(1). The court found the mother was a noncustodial parent requesting custody. Finding there was no clear and convincing evidence that Austin would suffer detriment, the court ordered that he be placed with the mother at her home in Las Vegas and granted her sole legal and physical custody of Austin. Specifically, the court stated:

> "The Court is going to place [Austin] with the mother with the following comments: This poor kid. . . . [¶] Neither parent has done any kind of a decent job with this child. And you wonder why he has behavioral issues? Geez. What a mystery there. [¶] But *I don't have clear and convincing evidence of detriment*. There is another child in that home who is doing okay. There [are] no referrals." (Italics added.)

Finding the history of the case was "disturbing," the court commented, "I wonder how many more states Austin is going to wind up living in, as they run away from [Child Protective Services]." The court then reiterated, "I don't have that clear and convincing evidence." The court explained that, while there were "red flags in Las Vegas," Austin had a successful visit and he was enrolled in school. The court noted that Austin was seen by his teacher on a daily basis, and she seemed to be involved in and aware of the issues. The court also noted that Austin and his sister were old enough to make a call if there were any issues.

The court ordered supervised visits for the father at least four times per month in the town where Austin was residing, as well as four phone calls per week at specified times. The court also ordered the mother to keep the father apprised of her telephone

19

number and address and to notify him at least 30 days in advance of any move out-of-state.

The court also terminated dependency jurisdiction over Austin. The father's appeal followed.

## DISCUSSION

### I. *SUFFICIENCY OF THE EVIDENCE* (*ORDER AWARDING LEGAL AND PHYSICAL CUSTODY OF AUSTIN TO HIS MOTHER*)

The father contends the court "committed reversible error when it placed Austin with his mother in the face of clear evidence of detriment." In appealing the court's order placing Austin with his mother at her home in Las Vegas and granting her sole legal and physical custody, the father challenges the sufficiency of the evidence supporting the court's finding under section 361.2, subdivision (a) that there was no clear and convincing evidence such placement would be detrimental to Austin's safety, protection, or physical or emotional well-being. He contends this case should be remanded to the court for new findings under section 361.2 and selection of a different placement for Austin.[4] The father's contentions are unavailing because substantial evidence supports the court's order and findings.

### A. *Applicable Legal Principles*

The juvenile court is required to hear evidence on the issue of the proper disposition for a child it finds to be a person described in section 300. (§ 358, subd. (a).)

---

4      The father suggests that Austin be placed with Austin's paternal aunt or maternal uncle in Texas.

20

The court has broad discretion to craft a dispositional order that is in the child's best interest. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179 (*Nada R.*).)

After the juvenile court removes a dependent child from the custodial parent, as the court did here,[5] it must determine whether there is a noncustodial parent who desires custody of the child. (§ 361.2, subd. (a), hereafter section 361.2(a); *In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1503 (*Nickolas T.*).) If the noncustodial parent requests custody, the court must "place" the child with that parent unless it finds such "placement" would be detrimental to the child's safety, protection, or physical or emotional well-being. (§ 361.2(a); *Nickolas T.*, at p. 1503.) "[T]he words 'place' and 'placement' in section 361.2[(a)] connote a temporary arrangement that necessarily involves the ongoing supervision of the juvenile court." (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1131.)

"[T]he presumption for placement with a noncustodial parent at a disposition hearing . . . furthers the legislative goals to maintain or place a child in the care of a parent when safe for the child, strengthen the child's relationship with siblings and other relatives, and avoid the child's placement in foster care." (*Nickolas T., supra*, 217 Cal.App.4th at pp. 1505-1506.)

"When making a custody determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.) In assessing detriment, the court "may consider

---

[5] The court determined by clear and convincing evidence pursuant to section 361, subdivision (c)(1), that removal of Austin from the father's custody was necessary for Austin's safety. The father does not challenge the court's order removing Austin from his custody.

any jurisdictional findings that may relate to the noncustodial parent under section 300, as well as any other evidence showing there would be a protective risk to the child if placed with that parent." (*In re V.F.* (2007) 157 Cal.App.4th 962, 970.) The court may also examine the circumstances of the parent and child, including whether the parent is able to provide a safe home for the child, the criminal and child welfare history of the parent, whether the parent remedied conditions that previously placed a child at risk, whether the parent stabilized his or her circumstances, and whether the parent maintained a parental relationship with the child. (*Nickolas T.*, *supra*, 217 Cal.App.4th at pp. 1505-1506.)

"[T]he fact a home is not ideal is not sufficient to establish detriment." (*Nickolas T.*, *supra*, 217 Cal.App.4th at p. 1505.)

A juvenile court's finding under section 361.2(a) that placement of a dependent child with a noncustodial parent would be detrimental to the child must be supported by *clear and convincing evidence*. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426 (*Luke M.*); *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1827.) "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*Luke M.*, at p. 1426.)

1. *Standard of review*

A fundamental rule of appellate review is that trial court rulings are presumed to be correct. (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 254, citing *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631.)

A juvenile court's findings under section 361.2(a) on the question of whether placement of a dependent child with a noncustodial parent would be detrimental to the

22

child is reviewed on appeal under the substantial evidence test. (*Luke M*., *supra,* 107 Cal.App.4th at p. 1426.)

Under the substantial evidence test, we review the record in the light most favorable to the findings of the court, drawing all inferences from the evidence that supports the court's determination. (*Nada R.*, *supra*, 89 Cal.4th at p. 1177.) "By this process we endeavor to determine whether evidence of reasonable, credible and solid value exists such that a reasonable trier of fact could find as the trial court did." (*Ibid*.) The juvenile court's decision "will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 230.) "It is not our function . . . to reweigh the evidence or express our independent judgment on the issues before the trial court." (*In re Jasmon O*. (1994) 8 Cal.4th 398, 423.)

B. *Analysis*

In support of his contention that the court committed reversible error in awarding legal and physical custody of Austin to the mother, the father asserts there was clear and convincing evidence that placing Austin with his mother in her home in Las Vegas would be detrimental to Austin's well-being. Thus, he asserts, "[s]ubstantial evidence does not support the [court's] finding that placement of Austin with [his] mother would not be detrimental to [his] safety, protection, or physical and emotional well-being."

We reject the father's contention. As already discussed, a juvenile court's finding under section 361.2(a) that placement of a dependent child with a noncustodial parent

23

would be detrimental to the child must be supported by clear and convincing evidence. (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1426.)

Here, viewing the evidence in the light most favorable to the court's order and findings, as we must (*Nada R.*, *supra*, 89 Cal.4th at p. 1177), we conclude substantial evidence—much of which the father disregards—supports the court's finding there was no clear and convincing evidence that placing Austin with his mother in Las Vegas would be detrimental to his safety, protection, or physical or emotional well-being. At the contested jurisdiction and disposition hearing in February 2015, the Agency's social worker, Swaykos, acknowledged the mother's history "could indicate risk." However, Swaykos opined there was no evidence to indicate Austin would be harmed if he were placed with his mother in Las Vegas. Swaykos testified the mother was currently using marijuana under a medical prescription but a parent's use of marijuana under a doctor's guidance did not necessarily pose a risk to the child unless it impacted the parenting or otherwise had an impact on the child. Regarding the mother's fiancé's methadone use, Swaykos testified she investigated his criminal history to determine whether there were indications he was abusing, as opposed to just using, the drug. She found none of the usual indicators of drug abuse, such as drug charges, violence charges, or police visits to the home

Swaykos reported in an addendum report that a Nevada social worker had recently visited the mother's home unannounced in January 2015 and found the home was clean, organized, and in a nice neighborhood. The social worker reported she had no concerns about Larry's medication use or any drug abuse. The daughter had not missed any days

24

of school and she was appropriately dressed and groomed. She had not witnessed any domestic violence or physical aggression in the home. Swaykos opined that the mother "appear[ed] to be able to keep a clean and physically safe home as well as meet [the daughter's] needs for educational and daily physical care."

In her addendum report for the continued contested disposition hearing held on March 27, 2015, Swaykos reported that during Austin's three-week trial visit with his mother in Las Vegas earlier that month, "things [went] well in school, the home, and with [Larry]." Swaykos also reported she spoke with Austin's new teacher in Las Vegas on March 23. The teacher reported that although Austin was struggling to catch up and to control his behavior, she thought he was "an awesome kid" who responded well to compliments and a behavior chart in the classroom. The teacher also reported that the mother asked her daily about Austin's behavior, demonstrated a willingness to implement behavior management changes and incentives at home, and was fully responsive to her suggestions. The teacher did not see any indications of abuse and reported that Larry had picked up Austin from school on two occasions during the trial visit, he had participated in the daily check-in with her, and she believed Larry was as invested and caring as the mother. Swaykos also reported that on the flight back to California, Austin told the social worker who accompanied him that he had a great visit with his mother, Larry was an "okay guy" who had taken care of him at night when his mother was working, he liked his new school and teacher, and he had made friends at school. Swaykos met with Austin at PCC and confirmed he had a good, fun visit at his mother's home, he liked his new school and teacher, there had been no fighting or yelling during the visit, and he felt safe

25

in his mother's home.  Swaykos opined that although the mother's history presented "many risk factors," her current circumstances indicated no safety concerns during the previous past year.

We conclude the foregoing substantial evidence supports the court's order awarding full custody of Austin to his mother.

## II.  *ORDER TERMINATING THE COURT'S JURISDICTION*

The father also claims the court "erred in terminating its jurisdiction over Austin in light of the risks to Austin evident in [his] mother's [Las Vegas] home."  He supports this claim with a series of arguments.  Asserting "the evidence show[ed] a need for continuing supervision," the father maintains termination of the court's jurisdiction was not in Austin's best interest.  He asserts the court terminated jurisdiction based not on "Austin's safety in [the] mother's home but on the Agency's unwillingness to accept liability for a risky placement outside its jurisdiction" in Nevada absent compliance with the requirements of the Interstate Compact on the Placement of Children (ICPC).[6]  Thus, he asserts, "even if the juvenile court's placement decision under section 361.2[(a)] is affirmed, its orders under section 361.2, subdivision (b), must be reversed and the case remanded for consideration of new placement orders to include [under section 361.2, subdivision (b)(3) (discussed, *post*),] continuing juvenile court jurisdiction and the

---

[6]     See Family Code section 7900 et seq.  "The ICPC governs the interstate placement of children, and generally requires that no child may be sent to another state for placement 'in *foster care or as a preliminary to a possible adoption*' unless the sending agency has first complied with the law's requirements."  (*In re A.J.* (2013) 214 Cal.App.4th 525, 541, quoting Fam. Code, § 7901, art. 3, subd. (a).)

provision of services to both parents."  He further asserts that, "[a]t the very least, the juvenile court should continue its jurisdiction long enough for a three-month home visit to be conducted [under section 361.2, subdivision (b)(2),] so that it can determine whether Austin is suffering detriment in his mother's custody and make appropriate changes to its orders if he is."

We conclude the father forfeited his claim of error by failing to challenge below the termination of dependency jurisdiction and by failing to request the relief he now seeks under section 361.2, subdivision (b) (hereafter section 361.2(b)).  Were it necessary to reach the merits of his claim, we would conclude he has failed to meet his burden of demonstrating the court abused its discretion in terminating jurisdiction because he has failed to establish there was a need for ongoing supervision.

A.  *Applicable Legal Principles*

1.  *Section 361.2(b)*

"[I]f the juvenile court finds that placing a child in the physical custody of a noncustodial parent would not be detrimental to the child within the meaning of section 361.2[(a)], it must place the child in the physical custody of the noncustodial parent."  (*In re Abram L.* (2013) 219 Cal.App.4th 452, 461.)  If the child is placed with the noncustodial parent, the juvenile court in the exercise of its discretion may choose one of three options set forth in section 361.2(b). (See *In re Abram L.*, at p. 461.)

First, under section 361.2(b)(1) the court may (as occurred here) grant legal and physical custody to the previously noncustodial parent and terminate its own jurisdiction.[7]

Second, under section 361.2(b)(2) the court may retain jurisdiction, order the previously noncustodial parent to assume custody subject to court's jurisdiction, and require that a home visit be conducted within three months.[8]

Third, under section 361.2(b)(3) the court may retain jurisdiction and order the previously noncustodial parent to assume custody pending the provision of services to the previous custodial parent, the new custodial parent, or both.[9]

2. *Standard of review*

"The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion." (*In re*

---

[7]    Section 361.2(b)(1) provides in part that the juvenile court may "[o]rder that the parent become legal and physical custodian of the child.  The court may also provide reasonable visitation by the noncustodial parent.  The court shall then terminate its jurisdiction over the child."

[8]    Section 361.2(b)(2) provides in part that the court may "[o]rder that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months."

[9]    Section 361.2(b)(3) provides in part that the court may "[o]rder that the parent assume custody subject to the supervision of the juvenile court.  In that case the court may order that reunification services be provided to the parent or guardian from whom the child is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child."

*Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.) The court's decision to terminate or continue jurisdiction upon placement with a noncustodial parent is reviewed for abuse of discretion. (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1128, 1135.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) A reviewing court will not disturb the juvenile trial court's exercise of discretion unless the trial court's decision was arbitrary, capricious, or patently absurd. (*Id*. at p. 318.)

The juvenile court does not abuse its discretion by continuing jurisdiction under section 361.2 when substantial evidence shows a need for continuing supervision. (*In re Austin P.*, *supra*, 118 Cal.App.4th at p. 1135.) The court also does not abuse its discretion by *terminating* jurisdiction under section 361.2 when substantial evidence shows no need for continuing supervision. (*In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1498, disapproved on other grounds by *In re Chantal S.* (1996) 13 Cal.4th 196, 203-204.)

B. *Analysis*

1. *Forfeiture*

County Counsel argues the father forfeited his claim of error. We agree.

As a general rule, a parent's failure to object or raise certain issues in the juvenile court prevents the parent from claiming error on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338 (*Lorenzo C.*).) Application of the forfeiture rule, although not automatic, is designed to keep litigants

29

from acquiescing and later seeking relief for error that could have been prevented or cured. (*In re S.B., supra*, at p. 1293; *In re Riva M.* (1991) 235 Cal.App.3d 403, 412.)

Appellate courts have applied the forfeiture doctrine to cases where a party failed to ask the juvenile court to exercise its discretion. (*Lorenzo C., supra,* 54 Cal.App.4th at p. 1339, citing (among other cases) *In re Anthony P.* (1995) 39 Cal.App.4th 635, 640-642 [failure to request sibling visitation as part of a permanent plan]; *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1830-1831 [failure to request alternative placement].) "These courts have taken the position that if the law does not require the juvenile court to act in a certain way, the parent bears the responsibility to care for his or her own interests by asking the court to exercise its discretion in a manner favorable to the parent. In such circumstances, the courts have not permitted the silent parent to argue that the juvenile court erred in not being psychic." (*Lorenzo*, at p. 1339.)

Here, the father did not ask the court to order an evaluation of the mother's home under the ICPC or take any other action to effectuate continued supervision of Austin in her home, nor did he object to termination of the court's jurisdiction after the court granted the mother sole custody of Austin. By his silence and acquiescence, he has forfeited his right to claim error on appeal. (*Lorenzo C., supra*, 54 Cal.App.4th at p. 1339.)

2. *Merits*

Were it necessary to reach the merits of the father's claim, we would conclude he has failed to meet his burden of demonstrating the court abused its discretion in terminating its jurisdiction. As noted, the juvenile court does not abuse its discretion by

terminating jurisdiction under section 361.2 when substantial evidence shows no need for continuing supervision.  (*In re Sarah M.*, *supra*, 233 Cal.App.3d at p. 1498.)

Here, substantial evidence supports a finding there was no need for continuing supervision.  Before it decided to issue custody orders and terminate jurisdiction, the court continued the disposition hearing in order to obtain additional relevant information and it carefully considered all of the evidence.  As pertinent here, the Agency recommended termination of the court's jurisdiction.  The Agency's social worker, Swaykos, testified there was no evidence to indicate Austin would be harmed if he were placed with his mother in Las Vegas.  Swaykos also testified the social worker in Las Vegas told her she had no concerns about the mother's or Larry's parenting of Austin's sister.  Austin's counsel testified that he agreed with the Agency's recommendations, and that Austin wanted to live with his mother and sister.  For all of the foregoing reasons, we affirm the court's order terminating its jurisdiction.

DISPOSITION

The orders and judgment are affirmed.

_____<br>NARES, Acting P. J.

WE CONCUR:


_____
McINTYRE, J.


_____
AARON, J.

31