Filed 6/22/16  In re Lilah M. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re LILAH M., a Person Coming Under the Juvenile Court Law. | B267080 |
| | (Los Angeles County Super. Ct. No. DK11003) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent.<br><br>v.<br><br>CARLOS M.,<br><br>Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Terry T. Troung, Commissioner.  Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Marsha F. Levine, under appointment by the Court of Appeal, for Respondent Lilah M.

No appearance for Plaintiff and Respondent.

Carlos M. (father) appeals from a juvenile court judgment assuming jurisdiction over his daughter Lilah M. (born Jan. 2008).  Father challenges the juvenile court's dispositional order placing Lilah in his custody subject to ongoing supervision.  Father argues that the trial court erred by failing to make express findings in support of its decision to require supervision.  In addition, father contends that the juvenile court abused its discretion in ordering continued supervision because substantial evidence did not support the court's finding that there was a need for ongoing supervision.

We find no reversible error and affirm.

## COMBINED FACTUAL AND PROCEDURAL BACKGROUND

**Initial referral and investigation**

On April 22, 2015, the Department of Children and Family Services (DCFS) received a referral from the Pomona Police Department stating that Laura C. (mother), the mother of Lilah and her two siblings,[1] had been arrested for driving a stolen vehicle and her three children were at the police station.[2]  The social worker observed that all three children were filthy and had scratches in various stages of healing and noted that Lilah was "parentified," checking on her two sisters and asking for diapers to change them.  Lilah, who was seven years old at the time, could not read or recognize her own name when written.

A police officer reported to the social worker that the stolen vehicle had been pulled over at gun point that morning.  Mother was driving and the three children were unrestrained.  The vehicle was filled with trash, dirty diapers and rotten food.  Officers located methamphetamine in the trunk.  Nothing found in the vehicle appeared to belong to the children.  The police officer added that Lilah had not been enrolled in school for a year and the children had not seen a doctor since Emily was an infant.

---

[1]     Mother is not a party to this appeal.

[2]     Lilah's two younger half-siblings, Abby (then age three) and Emily (then age two) are not subjects of this appeal.

Mother denied using methamphetamine, but appeared to be either under the influence of drugs or suffering from severe mental illness. Mother was arrested for theft of the vehicle, possession of methamphetamine, willful cruelty to a child and vandalism. Though mother said she did not know the car was stolen, she admitted intermittent drug use. Mother claimed to have lost the children's car seats. She said they had been staying in motels. Mother had no family or friends with whom she could stay, and had no diapers or clothing for the children. Mother did not know if the younger children's diapers had been changed that day.

Mother took Lilah out of school and had not taken her back for a year because Lilah had been bullied at school. Mother could not explain why she did not enroll Lilah in a different school. Mother was unsure when the children had last seen a doctor.

Mother said she felt depressed daily and wanted to kill herself. She had previously been hospitalized for several days on a psychiatric hold and believed the hospitalization was the result of smoking "crystal" multiple times a day. Thereafter, mother tried to kill herself with a knife but did not follow through because the children were present. According to mother, father had not been involved in Lilah's life and she did not have contact information for him and did not know where he lived.

When Lilah was interviewed, she said the family sometimes slept in the car with blankets, sometimes in a motel or someone's home. Lilah did not go to school because a girl was bullying her and mother said she did not have to go back. During the day, mother spent time trying to get money and food. They ate mostly chips and cookies, but sometimes people bought them better food. They approached people at gas stations for handouts.

Lilah claimed to have been sick for a long time. The social worker observed her to have a cough, runny nose, and congestion. Lilah said she had also been vomiting, but not that day. Lilah had not seen a doctor since before she was in kindergarten. Lilah asked the social worker several times for diapers so she could change her sisters' diapers. She said she had not seen her father since she was a baby, but that father bought her an

3

iPhone 6. When asked how she last saw father when she was a baby, but the iPhone was new, Lilah became confused.

DCFS interviewed father who said he last saw Lilah in December 2014. He saw Lilah once or twice a year, and had been unable to see her more because mother did not provide him with any information about their residence. Father had been trying to pay child support all of Lilah's life and when he fell behind, his license was suspended, which led to his arrest.

Father wanted to have a relationship with Lilah but was prevented from doing so by mother. Father stated that mother did not tell him anything. However, he knew that she did not have stable housing. He had heard about mother being excluded from certain housing arrangements and living in a car. Mother asked him to buy Lilah school supplies, but in December Lilah told father that she did not go to school. Father never had any evidence that mother used drugs, but was concerned by her behavior.

Father lived in Los Angeles with paternal grandparents, his sister and niece. He was willing to give up his bedroom and sleep in the living room if he could have Lilah in the home. Father had a lot of family support and agreed to have his home assessed.

**Petition**

On April 27, 2015, DCFS filed a petition on behalf of Lilah, Abby, and Emily, alleging that the children were at risk of serious physical harm pursuant to Welfare and Institutions Code section 300, subdivision (b),[3] because mother placed the children in a dangerous situation when she drove a stolen vehicle with the children as unrestrained passengers. The petition also alleged that mother possessed methamphetamine within access of the children, and that she had been arrested on April 22, 2015, for child endangerment, possession of a controlled substance, and vandalism. Finally, the petition alleged that mother had a history of substance abuse and mental and emotional problems.

---

[3] All further statutory references are to the Welfare and Institutions Code.

4

DCFS noted that mother had an extensive child welfare history revealing ongoing concerns that mother was neglecting the children. One prior referral for general neglect was substantiated, but mother's whereabouts became unknown.

**Detention**

In its detention report, DCFS recommended that Lilah be detained from father because he had limited contact with Lilah in the past. In addition, there was evidence that he knew of concerns related to mother's drug use and mental health but failed to intervene.

At the April 27, 2015 detention hearing, the juvenile court found that father was Lilah's presumed father. The court then found a prima facie case for detention of Lilah and her two siblings and ordered Lilah placed with father, with family maintenance services and an order that Lilah be assessed for counseling.

**Jurisdiction/disposition report**

In its jurisdiction and disposition report, filed June 22, 2015, DCFS reported that Lilah had been released to father on April 29, 2015. Mother reported that she met father in 2004 or 2005. Father was present for Lilah's birth and signed the birth certificate. Father provided Lilah with clothing, food and money. Father reported that he had just finished paying $8,000 in back child support for Lilah.

Lilah was interviewed and she explained that she and her siblings had lived with mother in motels but always got kicked out for some reason. At the time of mother's arrest they were living in the car. Lilah took care of her sisters by comforting them, changing their diapers and giving them food. Mother would leave them alone. They would watch television or Lilah would play outside with her sisters. Lilah did not have a car seat but her sisters had car seats until they were stolen.

Lilah reported that mother had told her about drugs. Lilah referred to the drugs as "dope," explaining that mother would put the dope into the inside of a pipe and smoke it. Mother told Lilah the truth because Lilah is her daughter. Lilah reported that mother tried to kill herself with a knife, but Lilah took the knife from her and asked her to stop.

5

Mother hits herself on the face with her hand. Lilah explained that she took care of her mother and her sisters.

When mother was interviewed at the detention center where she was residing, she said the car belonged to her friend and mother was unaware that it had been stolen. The minors were in the car and had taken off their seat belts. Mother was working on getting new car seats. Mother stated that the methamphetamine in the car did not belong to her, although she admitted the backpack in which it was found was hers. Mother denied that the children were dirty. She stated that Lilah had frequent "peeing" accidents and that Abby had thrown up the night before and the car still smelled. Mother added that Lilah would take care of her sisters because she felt that it was her job.

Mother admitted to being hospitalized when she was pregnant with Emily. She had stopped eating and was using crystal daily. Mother started using crystal when she was 11 years old. However, she stated that she last used it two months before she was pulled over in the stolen car. She admitted to using drugs while the children were in her care.

In June 2015, father was interviewed by telephone. He admitted he was aware that mother was always around drugs, however, when she was with father, mother did not use drugs. Father stated that he was "pretty sure" that mother had used drugs and he was aware that "[t]he people she's with" use drugs, but he did not suspect she currently used drugs.

Since she had been living with father, Lilah told father that she had seen mother with drugs and pipes. Father explained that since he and mother separated, mother moved from place to place and has not been stable. Father saw mother living in a garage and offered to take Lilah. Father was aware that mother was receiving help from welfare, but Lilah told him mother spent the money on drugs. Father did not believe mother had mental health problems, rather he believed it was an act. Mother would not accept the help people would offer. Father stated that mother's problems stemmed from her character and attitude and the way she was living.

6

DCFS noted that the family's strengths included that the parents had family support and that Lilah appeared bonded with her father and paternal relatives. Mother was willing to comply with DCFS and court orders. It was recommended that Lilah be referred to the Regional Center. She had not consistently attended school and did not independently dress herself or care for her own hygiene. Lilah continued to have a daily enuresis problem. Father was having difficulty enrolling Lilah in school.

Father was hesitant about allowing Lilah to visit mother in jail because he felt it would negatively affect the child. The social worker informed father that Lilah should visit her mother as soon as possible, and that Lilah was old enough to understand that mother is incarcerated.

DCFS recommended that although father is non-offending, the family would benefit from further supervision, including parenting education for father and appropriate services for Lilah, including counseling with a licensed therapist.

**Jurisdiction hearing**

At the jurisdiction hearing on June 22, 2015, the juvenile court assumed jurisdiction over Lilah and her two siblings pursuant to section 300, subdivision (b). Mother pled no contest to the allegations. The juvenile court continued the matter for disposition and ordered DCFS to prepare a supplemental report to include a recommendation regarding termination of jurisdiction over Lilah with a juvenile custody order.

In a last minute information for the court filed on July 6, 2015, DCFS reported that father said he would follow through with services for Lilah, including counseling services, Regional Center services and enrolling the child in school if the case is closed. Therefore, DCFS recommended that Lilah's case be closed with a family law order granting father full custody with monitored visitation for mother.[4]

---

[4] Because DCFS recommended that the juvenile court terminate jurisdiction and issue a custody order granting father custody of the child, DCFS has taken no position in this appeal. Instead, the respondent in this matter is the child Lilah, whose attorney argued that ongoing supervision by the court was warranted at disposition. In the

**Disposition hearing**

The disposition hearing was held on July 7, 2015. At the outset of the hearing, the court noted that DCFS recommended terminating jurisdiction over Lilah. Counsel for Lilah was not in favor of terminating jurisdiction and asked the court to exercise its discretion to continue jurisdiction for three months. Counsel asserted that father had not been in Lilah's life much since she was two years old, and though father had some idea that Lilah was in an unstable situation, he allowed it to continue, despite warnings that Lilah was not in a good place. Further, Lilah's counsel noted that Lilah had not started therapy. Although Lilah's counsel was pleased that Lilah was with father, she argued that it would be more prudent to continue jurisdiction for three months to ensure that services were in place and perhaps provide some parenting support.

Despite the positions taken by father and DCFS, the juvenile court opted to retain jurisdiction over the case: "I need for [father] to ensure that his daughter receives a referral for IEP assessment, that she be in individual counseling, that there is a referral for educational psychological assessment of his daughter, Regional Center referral as well as a JCMHS [mental health services] referral."

The matter was continued to January 5, 2016, for a status review hearing.

Father filed a timely notice of appeal from the July 7, 2015 orders.

## DISCUSSION

**I. Failure to make express findings regarding the basis of the decision under section 361.2, subdivision (c)**

*A. Applicable law and standard of review*

Section 361.2 requires that when a court orders a child removed from a parent, it must determine whether there is another parent who desires to assume custody of the child. If that parent requests custody, the court must place the child with that parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. (§ 361.2, subd. (a).)

_____

discussion section of this opinion, Lilah shall be referred to alternatively as Lilah or respondent.

Under section 361.2, subdivision (b), the juvenile court may do one of three things: (1) order that parent to become legal and physical custodian of the child and terminate jurisdiction; (2) order that the parent assume custody subject to the jurisdiction of the court and require a home visit within three months; or (3) order that the parent assume custody subject to the supervision of the juvenile court.

Under section 361.2, subdivision (c), the court "shall make a finding either in writing or on the record of the basis for its determination under subdivisions (a) and (b)."

Whether or not a court complied with section 361.2 is primarily a question of law. (*In re Abram L.* (2013) 219 Cal.App.4th 452, 462 (*Abram L.*).) However, any error is subject to a harmless error analysis. (*Id.* at p. 463.) Under this analysis, we cannot reverse the court's judgment unless the error was prejudicial. We must determine whether it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*Ibid.*)

### B. Forfeiture

Respondent minor argues that father's challenge to the trial court's failure to make an express finding of the basis for its decision pursuant to section 361.2, subdivision (c), has been forfeited by virtue of his failure to raise the issue below. Father acknowledges that the issue was not raised below, but states that the appellate court has discretion to address the issue. Father cites *Abram L.* to support his argument that this court should exercise its discretion to address this issue.

In *Abram L.*, the father argued that the juvenile court failed to make express findings that placing the children in his custody would be detrimental to the children under section 361.2, subdivision (a). Nothing in the record suggested that the juvenile court had even considered the requirements of section 361.2 in denying father's request for custody of the children. (*Abram L., supra*, 219 Cal.App.4th at pp. 460-461.) Thus, the *Abram L.* court determined that the juvenile court did not apply the correct law to the father's request for custody. (*Id.* at p. 461.) The *Abram L.* court found that the father did not forfeit the argument because the father's counsel had argued below that DCFS did not meet its burden of showing that placing the children in the father's custody would create

9

a substantial risk of detriment. This argument appeared to be based on section 361.2, subdivision (a); therefore the argument was not forfeited on appeal. (*Id.* at p. 462.)

In the present case, in contrast, there was no question that father's request for custody was subject to section 361.2. Lilah's counsel asked that the court exercise its discretion to continue jurisdiction for three months pursuant to section 361.2, subdivision (b). Father's counsel argued that there was no substantial evidence that DCFS needed to be involved. While it was clear that section 361.2 was at issue, father's counsel did not object to the trial court's ruling on the ground that the court failed to explain its reasons for keeping the case open under section 361.2, subdivision (c).

We find that under the circumstances of this case, the issue is forfeited. The juvenile court made clear its reasoning for keeping the case open. The court directed father to "ensure that his daughter receives a referral for IEP assessment, that she be in individual counseling, that there is a referral for educational psychological assessment of his daughter, Regional Center referral as well as [mental health] referral." The court's statements made it clear that the court wanted to keep the case open in order to receive confirmation that Lilah was obtaining the services that she needed. If father remained uncertain of the basis for the juvenile court's decision to keep the case open, father had an obligation to raise an objection and ask the court for further explanation.

### C. *It is not probable that a result more favorable to father would have resulted in absence of the alleged error*

Even if the juvenile court had erred in failing to expressly state the basis for its decision to retain jurisdiction, we would find any such error to be harmless.

Father cites *In re J.S.* (2011) 196 Cal.App.4th 1069 (*J.S.*) in support of his argument that the error is not harmless. In *J.S.*, a child removed from his mother's custody was placed with his father. At a contested disposition hearing, mother argued that jurisdiction should be retained to ensure that services were made available to both her and father. (*Id.* at p. 1074.) The court was strongly inclined to this view at the beginning of the hearing. However, the matter was continued several times and at the end of the final resumed hearing, the court announced its intention to place custody with

10

father, with visitation for mother, and terminate jurisdiction. (*Id.* at p. 1076.) On appeal, mother argued that the juvenile court erred in failing to make a finding explicitly supporting its decision to divest itself of jurisdiction. (*Id.* at p. 1077.) The appellate court agreed that the juvenile court failed to comply with the statutory requirement of "'a finding either in writing or on the record of the basis for its determination.' [Citation.]" (*Id.* at p. 1078.)

In discussing the error, the appellate court noted that "[a]n express finding on a contested issue -- or a statement of reasons for a judicial decision -- can shape and improve the adjudicatory process through either or both of two mechanisms. First, it can directly influence the trial court's *actual reasoning process* by compelling it to consciously consider and resolve specified issues. Second, it can *enhance appellate review* of the trial court's reasoning by making that reasoning explicit and reducing, if not eliminating, the role of inference on appeal." (*J.S., supra*, 196 Cal.App.4th at p. 1078.) However, the appellate court ultimately concluded in *J.S.*, as we conclude here, that the error was harmless. The court stated, "we can see no reasonable probability that had the trial court complied with the statutory requirement, it would have answered differently the question whether to terminate its jurisdiction in this matter. The court addressed itself assiduously to that question, which was the predominant subject of hearings over portions of three days." (*Id.* at p. 1079.)

Similarly, in this matter, the juvenile court heard and considered arguments from counsel for both father and Lilah as to whether continued jurisdiction was appropriate. The court considered the evidence that Lilah had been parentified and had witnessed her mother using drugs. The court also considered Lilah's counsel's indication that there was no evidence that Lilah was yet in counseling. The juvenile court ordered father to ensure that his daughter received "IEP assessment, . . . individual counseling, . . . educational psychological assessment[,] . . . Regional Center referral" as well as a mental health referral. This pronouncement on the record appears to reveal the precise reason that the court chose to retain jurisdiction. Thus, there can be no reasonable probability that the court would have reached a different conclusion had it been asked to make express

findings under section 361.2, subdivision (c).  We therefore find that any error in the juvenile court's failure to articulate the basis for its determination is harmless under the circumstances of this case.

## II.  Failure to terminate jurisdiction

Father next argues that the juvenile court erred when it ordered that father assume custody of Lilah subject to the juvenile court's jurisdiction.

A juvenile court's decision regarding termination of jurisdiction is reviewed for abuse of discretion.  (*J.S., supra*, 196 Cal.App.4th at p. 1082.)  Under this standard, we do not disturb the court's ruling unless an abuse of discretion is clearly established.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)  To warrant reversal, the challenged determination must exceed the bounds of reason.  (*Id.* at pp. 318-319.)  The juvenile court's factual findings are reviewed for substantial evidence.  (*In re A.J.* (2013) 214 Cal.App.4th 525, 535, fn. 7; see also *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1134 [evidence supporting need for continued supervision reviewed under substantial evidence standard].)

Father cites *In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1496 (*Sarah M.*), disapproved on other grounds in *In re Chantal S.* (1996) 13 Cal.4th 196, as support for his argument that the decision whether to terminate jurisdiction is based on whether there is a need for ongoing supervision over a child.  As the *Sarah M.* court noted, "[w]hile placement of the child with the formerly noncustodial parent may not be detrimental, there may be some concern that . . . this new custodial parent may need services."  In addition, the *Sarah M.* court explained, it is possible that "the court may see a need to provide services short of reunification for the child's best interests.  Thus, supervision may be appropriate in lieu of or before terminating jurisdiction."  (*Sarah M.*, at pp. 1496-1497.)

This language from *Sarah M.* supports the juvenile court's decision to continue jurisdiction in this matter.  The evidence showed that father had never been much involved in Lilah's life, seeing her once or twice a year.  The evidence also showed that father was aware that Lilah was not in a good situation.  Father knew that the people

12

mother spent time with used drugs, and he knew that Lilah was not enrolled in school. He was also aware that mother was unstable and moved from place to place. In spite of this information, father failed to intervene in Lilah's life or protect Lilah from being subjected to this lifestyle.

Furthermore, the social worker made it clear that Lilah was in need of immediate counseling with a therapist. However, at the time of the jurisdiction/disposition hearing, Lilah had not begun therapy at all. For this reason Lilah's counsel asked the court to continue jurisdiction to ensure that services were put in place and parenting support be provided to father if needed.

Father emphasizes that Lilah was doing well in his care and that he was willing to obtain services for Lilah. Father contends there was no evidence that the heavy hand of juvenile court law was needed to ensure that Lilah received services. We disagree. Father had custody of Lilah starting on April 29, 2015. By the time of the disposition hearing on July 7, 2015, father had not enrolled Lilah in school nor had he obtained any of the necessary services for Lilah.

Sufficient evidence supported the juvenile court's decision that continued jurisdiction was appropriate in order to ensure that Lilah received the necessary services. There was no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.
HOFFSTADT

13