Filed 3/16/21  In re A.C.C. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.C.C., et al.,<br><br>        Persons Coming Under the<br>        Juvenile Court Law. | |
| SAN FRANCISCO HUMAN<br>SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.C.N,<br><br>        Defendant and Appellant. | A160632<br><br>(City & County of San Francisco<br> Super. Ct. Nos. JD19-3200,<br> JD19-3200A, and JD19-3200B) |

J.C.N. (Mother) appeals the juvenile court's orders granting her ex-husband J.C. (Father) sole physical custody over their three children and terminating dependency jurisdiction.  We affirm.

**BACKGROUND**

This dependency case involves Mother and Father's three minor children, A.C.C., C.C.C., and J.C.C., born in 2011, 2012, and 2014, respectively.  After Mother and Father divorced in 2017 following four years of marriage, they shared equal physical custody of the three children.

In July 2019, Father noticed bruises on J.C.C.'s ears when the children returned from a weekend visit with Mother.  J.C.C. said that Mother's

1

boyfriend, Jorge C., had picked him up by his ears after he wet himself. J.C.C.'s siblings said Jorge also pulled their ears when they behaved badly.

Father brought J.C.C. to the hospital, where the doctor expressed concern for "non-accidental trauma" due to the pattern of bruises on the ears. Father obtained an emergency protective order to protect the children from Jorge and referred the matter to the San Francisco Human Services Agency (Agency), which began an investigation.

Shortly after receiving the referral, an Agency social worker met with Mother. Mother explained that she worked full time at a child development center, and neither she nor Jorge, her live-in boyfriend who is a police officer, hit the children. She said she did not see any bruises on her son that day, and the children had not been left alone with Jorge. She refused to have Jorge move out because she did not believe he had anything to do with the incident.

On August 6, 2019, Agency staff interviewed all three children. All three disclosed that Jorge pulled their ears. J.C.C. said that when he visited Mother over the weekend, Mother told him he had lied about Jorge pulling his ears. J.C.C. told Mother he did not lie about the incident.

On August 8, 2019, the Agency filed a Welfare and Institutions Code[1] section 300 dependency petition. At the detention hearing the next day, the court found the Agency had established a prima facie case that the children came within section 300 and that there was a substantial danger to their physical health and no reasonable means to protect them without removing them from Mother. The court approved placement with Father and ordered supervised visits between Mother and the children. Days later, Father

---

[1] All statutory references are to the Welfare and Institutions Code.

requested and received a temporary restraining order protecting the children from Jorge.

On September 26, 2019, the Agency filed an amended dependency petition with a single section 300, subdivision (b)(1) allegation that Mother "failed to protect the children from physical abuse by her live-in boyfriend . . . in that on 7/29/2019, the child, [J.C.C.] reported that the mother's [b]oyfriend, pulled his ears because he did not listen to him." The amended petition further alleged that J.C.C. sustained bruising on both sides of his ears, and that the doctor treating him ruled it as non-accidental trauma.

The Agency's amended disposition report, filed September 26, 2019, recommended the section 300 petition be sustained and that the children reside with Father with family maintenance services and that supportive services be provided to Mother.

According to the report, since detention, the children lived full-time with Father, as well as their paternal grandparents and an aunt. While the children experienced some difficulties with family circumstances and J.C.C. in particular faced challenges with his first year in school, all children were doing well in school and in good health. Father had refused to consent to any health assessments for the children, so the Agency requested the court grant it permission for such tests.

The report summarized meetings Agency case workers had separately with each parent. Mother said that when her children were detained, she did not understand Jorge's actions constituted inappropriate discipline and had a difficult time accepting the disclosures made by her children. She did not realize the children were being abused while she left them with Jorge when she worked. After reflecting on the situation, she was prepared to do a better job protecting her children in the future. While she felt her parenting skills

3

were good and that she was able to meet the children's needs, she also recognized that she could use additional skills and support in order to have a better understanding of physical abuse. She was attending a parenting class and invited constructive criticism on her parenting. Since August 2019, she had been seeing the children at least twice weekly in supervised visits at an agency in the community.

Father explained that he would do anything to protect his children. He stated he could improve on his parenting skills but felt he was doing a great job. He did not physically discipline the children.

Both parents felt that co-parenting with the other was not easy. Before the dependency case began, the parents were in family court attempting to work out how to best care for the children medically, financially, and emotionally. On several occasions, the social worker witnessed how difficult it was for the two to work together as civil adults with children in common.

The disposition report also observed that Father "appear[ed] not to fully understand the trauma that his children [have] experienced over the years," and he needed support for this. Mother needed help to understand how to be open and honest about what happened in order for her to be fully able to advocate for her children in a more effective manner. The Agency concluded that the parents needed to address their mistrust towards each other and to work together respectfully.

The juvenile court found the section 300, subdivision (b)(1) allegation true. It declared dependency and ordered the children to reside with Father and supervised visits with Mother. It also ordered family maintenance services for Father and supportive services for Mother.

In December 2019, the parties agreed to a stay away order which was adopted by the juvenile court. Jorge was ordered to stay away from the children, even if he was in a relationship with Mother.

The Agency's six-month status review report, filed in late February 2020, recommended the dependency case be dismissed and jurisdiction of the juvenile court terminated. It also recommended that Father be granted sole legal and physical custody of the children.

According to the report, the children continued to live with Father and their paternal grandparents. Father continued to provide the children suitable care. Working multiple jobs, he managed the children's schedules, schoolwork, meals, and bedtimes, sometimes with the help of their grandparents. When necessary, he disciplined the children appropriately. Father and all three children "show[ed] a strong bond."

None of the children were in therapy because Father believed they did not need it, and the children did not show they wanted to discuss what occurred while in their Mother's care. Father declined individual therapy, finding his own personal workout routine and spending time with the children sufficient for self-care. While the Agency would have liked to see the family engage in therapeutic services, the social worker never witnessed any of the children display behaviors indicating their emotional needs were not met.

In the social worker's view, the children "consistently presented as happy and [were] reported by the school as showing improvement in their education as well as their socialization. [Father] . . . maintained a consistent schedule around picking them up from school on time and ensuring they [were] on a daily homework routine. The three children . . . [were] not currently exposed to any observed harm or danger . . . [and] [were] not

5

showing any concerning behaviors that should indicate a change in placement." Teachers reported that the children were doing well in class and had no major concerns about them. The social worker added that Father "consistently maintained a safe and sober environment for the children and ha[d] not exposed them to any risk or danger."

The six-month report also discussed Mother's visits with the children. By early January 2020, her visits became unsupervised. At the time of the report, the visitation plan consisted of two three-hour visits per week at a nearby shopping mall, which the parents were able to handle without the Agency's involvement. All three children reported a positive relationship with Mother and feeling happy and excited when they get to spend time with her, and sad when a visit was missed. The social worker observed that all children showed a positive connection with Mother and that Mother "demonstrated a loving relationship between herself and the children."

In July 2020, the Agency submitted an Addendum Report before the contested review hearing, which was delayed multiple times due to the pandemic and later due to protests near the courthouse. The Agency maintained its recommendation that the court dismiss the dependency and terminate jurisdiction, since there were no apparent safety threats, risks or dangers facing the children while in the care of either Father or Mother. It also maintained its recommendation for sole physical custody with Father, but changed its recommendation for legal custody to be jointly held by Mother and Father.

The report discussed positive recent developments regarding Mother's visitation with the children. Beginning in May 2020, she was allowed unsupervised visits with the children, which still needed to occur in a public setting due to ongoing concerns that she remained in contact with Jorge. In

6

June 2020, however, the social worker received a copy of a lease that indicated Jorge no longer lived with Mother. Later, the social worker visited Mother's house and saw no evidence indicating Jorge lived there nor any other safety issues. The children also reported that they never saw Jorge during any of their visits with Mother. The Agency concluded Mother and Jorge no longer lived together. In July 2020, the Agency approved unsupervised home visits that could expand to overnight ones if the day visits went well.

On July 23, 2020, the juvenile court held the contested hearing, and heard testimony from the social worker, Father, and Mother.

The social worker, who had been managing the family's case for nearly 10 months, testified that the Agency maintained its recommendation for sole physical custody to Father because the children were safe in their Father's care. They were well-taken care of by Father and generally happy in his care. He explained that the Agency changed its recommendation to joint legal custody to ensure Mother retained parental rights, preserved her ability to visit and spend time with the children, and could participate in decision-making around their lives.

The social worker also reported that the children's teachers had very positive comments about them. Their teachers had noticed improvements in the children around the time they began living with Father full-time. Their homework was completed more frequently. They were better able to socialize with other children. They were consistently picked up on time.

The social worker discussed Mother's visits. Once a week, Mother had day-long unsupervised visits with them in her home, and the first one had gone well. Based on observing Mother's home on multiple occasions and verifying that Jorge no longer lived there, the Agency's safety concerns

7

subsided. The social worker added that Mother had tended to miss visits during periods when the visitation schedule transitioned.

As to Father, the social worker acknowledged that he had not engaged in any individual or family therapy, which had been part of the case plan. He did, however, eventually take the children to be assessed, and none met medical necessity for mental health services.

The social worker explained that communication between the parents was difficult, but he believed they could communicate around decision making for the children's education and health. In his view, the parents ultimately made reasonable decisions when it came to the care of the children, and both tried to ensure the children were safe.

Father testified that he wanted full physical and legal custody of the children. He said Mother missed over 15 visits since the dependency case began. He faulted her communication. He expressed frustration with her failures to confirm visits in advance. If the court ordered joint legal custody, he did not think he would be able to communicate with her.

While comfortable with Mother visiting the children in public settings, he opposed overnight visits because he feared for the children's safety. He claimed Mother was verbally abusive to them, referring to an incident where Mother had purportedly told C.C. that she did not want her to visit again if she misbehaved. Father also said he saw Mother and Jorge together a few weeks earlier despite Mother's claims they had separated. He acknowledged, however, that the children had not seen Jorge for months.

In Mother's testimony, she expressed her desire for joint physical custody. She asserted that it was in the children's best interest to live with both parents. She believed she needed a court order for joint physical custody

8

because Father was "going to use any opportunity to keep the children away from [her] whenever he [could]."

Mother believed the children had been safe with Jorge. None of the children ever told her Jorge hurt them, and she never saw "bruises or anything physical on the children." She was no longer in a relationship with Jorge, nor was she considering reuniting with him. Since January 2020, she had not seen or communicated with him.

Addressing her missed visits, she explained she was job training when she missed visits in October 2019 and then missed two weeks in November and December 2019 due to jury duty. Unsupervised visits began in January 2020 but were suspended due to the pandemic. For several months, she had virtual visits with the children, but they were not in appropriate places, such as the car or Father's living room while his other family members were present. During one virtual visit, Father's sister started to argue with Mother and "made accusations and spoke about the whole case in front of the kids." In May 2020, unsupervised in-person visits resumed. At this point, it was her belief that she no longer needed to confirm visits in advance, which led to confusion and a missed visit.

For 12 weeks, Mother took a parenting workshop she found on her own, and noted the Agency had not referred her to any services to help her with her parenting. From these classes, she learned that she could stop the trauma from her own childhood continuing to her children.

The juvenile court found the children were doing "very well" in Father's care with regular visits to Mother. It accepted the Agency's custody recommendation and ordered joint legal custody and sole physical custody to Father. It further ordered overnight visits with Mother, which would begin after one month of unsupervised day visits. The court also observed that the

9

"intense atmosphere caused between the parents" was not a sufficient basis for it to continue to exercise jurisdiction over the children. The court dismissed the petition and terminated jurisdiction.

Mother now appeals. She did not file a reply brief as part of her appeal.

## DISCUSSION

### A.    Order Terminating Dependency Jurisdiction

Mother contends the court erred when it terminated dependency jurisdiction. We disagree.

When a child is adjudged a dependent and remains in a parent's home, the court reviews the status of the case every six months under section 364. Under that provision, the juvenile court "shall determine whether continued supervision is necessary. The court shall terminate its jurisdiction [absent] a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c).)

In this review, "the court is not concerned with reunification, but in determining 'whether the dependency should be terminated or whether further supervision is necessary.' [Citations.] This is so because the focus of dependency proceedings 'is to reunify the child with *a parent*, when safe to do so for the child.'" (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20.) Section 364, subdivision (c) establishes a "statutory presumption in favor of terminating jurisdiction and returning the children to the parents' care without court supervision." (*In re Shannon M.* (2013) 221 Cal.App.4th 282, 290.)

We review a court's decision under section 364 for substantial evidence and will reverse only if the evidence compels continuation of jurisdiction as a matter of law. (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1156 [listing

cases applying substantial evidence standard for appellate review of orders made under section 364]; *In re N.S.* (2002) 97 Cal.App.4th 167, 172 ["In reviewing the sufficiency of the evidence on appeal, we look to the entire record for substantial evidence to support the findings of the juvenile court."].)[2]

Here, the conditions that led to the dependency no longer existed, nor was there any indication such conditions were likely to exist upon termination of jurisdiction. The court assumed jurisdiction because Mother had been unable to protect the children from the physical abuse of her live-in boyfriend Jorge, who had pulled the children's ears to discipline them, causing bruising and non-accidental trauma. In the months since the court took jurisdiction, the Agency verified that Jorge no longer lived with Mother, and Mother herself testified she had not seen or contacted him for months and had no intention of reuniting with him. In light of these changes, the Agency no longer had concerns about the children's safety with Mother during visits. Nor was there any concern about the children's safety with Father whose care they had been under for the nearly yearlong dependency without incident. At the review hearing, the social worker testified that both parents were able to ensure that the children were not in any danger. Accordingly, the court did not err in concluding court supervision was no longer necessary, and termination of jurisdiction was proper.

Mother asserts the court erred because "even though the children were doing well in father's care, several important factors—which posed a continuing risk to the children—remain unresolved." These included

---

[2] Mother asserts we review a juvenile court's decision to terminate dependency jurisdiction under the abuse of discretion standard. Even under this standard, we would not reach a different conclusion on the propriety of the court's order terminating jurisdiction.

11

Father's refusal to consent to have the children assessed for mental health or emotional issues and his failure to understand the trauma the children have experienced and to engage in individual or family therapy. None of these constituted grounds for the court's ongoing jurisdiction. Contrary to Mother's assertion, Father eventually brought the children for mental health assessments, and none of them met the medical necessity standard for services. Further, despite Father's resistance to therapy, the Agency found no safety risks to the children in his care. As noted, the Agency believed both parents were able to ensure the children were not in danger.

Mother also argues the case should have remained open to allow the Agency to observe a longer history of parental cooperation at visit exchanges, given the difficulty the parents have had in the past navigating these issues. She points to other interpersonal conflict between her and Father or members of his family. These issues were not grounds for continued jurisdiction either. (See *In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1498–1499 ["[I]f parents' poor communication skills and distrust established a need for its continued supervision, the juvenile court could assume or continue jurisdiction in virtually every family law case involving custody or visitation issues."], disapproved on other grounds in *In re Chantal S.* (1996) 13 Cal.4th 196, 202–204.)

Finally, Mother contends the Agency had failed to provide her with sufficient services to reunify with her children, notwithstanding the court's order at disposition that she participate in parenting classes and therapy. She says she demonstrated she was capable of change and such services would have helped her, so the Agency's inaction "presented a sufficient roadblock to terminating the dependency case." This, too, was not reason to continue jurisdiction. Mother was not entitled to reunification services since

the children had been placed with Father at disposition. (See § 16507, subd. (b) ["[f]amily reunification services shall only be provided when a child has been placed in out-of-home care, or is in the care of a previously noncustodial parent under the supervision of the juvenile court"]; *In re A.L.* (2010) 188 Cal.App.4th 138, 145 [no reunification services called for when a child is not removed from a custodial parent].)[3] Moreover, as discussed, the paramount consideration at a section 364 hearing is whether conditions that led to the court's jurisdiction continue or were likely to continue without the court's supervision. (§ 364, subd. (c).) Whether the Agency provided Mother services did not bear on the determinative issue of the children's safety. On that point, there was substantial evidence that when jurisdiction was terminated, the children were safe with both parents.

## B.     Order Granting Father Sole Physical Custody

Mother also contends the court abused its discretion when it awarded Father sole physical custody of the children. Again, we disagree.

" 'When a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make "exit orders" regarding custody and visitation. [Citations.] Such orders become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court.' " (*In re A.C.* (2011) 197 Cal.App.4th 796, 799.) "When making a custody determination in any dependency case, the

---

[3] At disposition, Mother was offered "supportive services," not reunification services. The Agency represents, and Mother does not dispute, that "supportive services" are San Francisco County's name for "enhancement services," which in dependency jargon describe " 'child welfare services offered to the parent not retaining custody, designed to enhance the child's relationship with that parent.' " (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 212.) Mother provides no authority that such services were designed to reunify her with the children.

13

court's focus and primary consideration must always be the best interests of the child. [Citations.] Furthermore, the court is not restrained by 'any preferences or presumptions.' [Citation.] Thus, for example, a finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not be in the child's best interests for a variety of reasons. [Citation.] By the same token, a finding that the parent from whom custody was removed no longer poses a risk of detriment or that the parent whose custody has been subject to supervision no longer requires supervision is relevant to, but not necessarily determinative of, the best interests of the child." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 (*Nicholas H.*).)

We review the juvenile court's decision to issue a custody (or "exit") order for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) "[W]hen a court has made a custody determination in a dependency proceeding, ' "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Here, the juvenile court did not abuse its discretion in awarding sole physical custody of the children to Father. There is no doubt that Mother made great efforts to address the issues that precipitated the dependency. She appears to have severed ties with Jorge, took a parenting class, and created a safe space for the children in her home. We also understand that the children reported feeling happy and excited when visiting Mother. The juvenile court's paramount concern in determining custody is the best interests of the child based on the totality of the circumstances. (*Nicholas H.*, *supra*, 112 Cal.App.4th at p. 268.) The court found the children were "doing

very well" with their current placement.  The social worker even shared feedback from the children's teachers of all the positive developments with respect to academics and socializing with peers.  It was reasonable for the juvenile court to maintain the status quo on physical custody to not disrupt the children's progress, especially in light of its decision to allow Mother to retain joint legal custody of the children and have increased visitation.  Based on the record before us, we conclude the juvenile court did not abuse its discretion in granting Father sole physical custody of the children.

## DISPOSITION

The juvenile court's order terminating jurisdiction and granting father sole physical custody of the children is affirmed.

_____

Wiseman, J.*

WE CONCUR:


_____

Fujisaki, Acting P.J.


_____

Jackson, J.

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16